1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID HAWK,<br><br>        Petitioner,<br><br>    v.<br><br>DAVID DAVEY,<br><br>        Respondent. | Case No. 1:16-cv-00795-JLT-EPG-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

        Petitioner David Hawk is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

        On August 28, 2009, Petitioner was convicted by a jury in the Kings County Superior Court of premeditated murder for financial gain, willfully failing to file tax returns, misappropriating trust property in excess of $50,000, making a false financial statement, and perjury. On December 4, 2009, Petitioner was sentenced to an imprisonment term of life without the possibility of parole plus nine years. (14 CT[1] 3984–88.) On August 27, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Hawk, No. F059371, 2014 WL 4243705, at *44 (Cal. Ct. App. Aug. 27, 2014). On November 12, 2014, the California

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 58.)

1    Supreme Court denied Petitioner's petition for review. (LD[2] 50.) On April 27, 2015, the United

2    States Supreme Court denied the petition for writ of certiorari. (ECF No. 1 at 2.)[3] On April 25,

3    2016, Petitioner filed a state habeas petition in the California Court of Appeal, Fifth Appellate

4    District, which summarily denied the petition on April 26, 2016. (LDs 51, 52.) On April 29,

5    2016, Petitioner filed a petition for review in the California Supreme Court, which denied the

6    petition for review on June 8, 2016. (LDs 53, 54.)

7         On June 8, 2016, Petitioner filed the instant federal petition for writ of habeas corpus.

8    (ECF No. 1.) Petitioner also moved to stay the petition in light of the recent discovery of the

9    victim's body and the pending motions in state court for the remains to be forensically examined

10   and DNA evidence to be tested. (ECF No. 2.) On July 28, 2016, this matter was stayed. (ECF

11   No. 6.) On May 13, 2021, Petitioner filed a state habeas petition in the California Supreme

12   Court, which denied the petition on August 25, 2021. (LDs 55, 56.)

13        On September 27, 2021, the stay was lifted. (ECF No. 39.) Although Petitioner was

14   granted the opportunity to file an amended petition in order to incorporate any newly discovered

15   evidence, Petitioner decided to proceed with the original petition. (ECF Nos. 53, 55.) In the

16   instant petition for writ of habeas corpus, Petitioner raises the following claims for relief: (1) the

17   prosecution's failure to provide exculpatory and impeachment evidence as required by Brady v.

18   Maryland, 373 U.S. 83 (1963); (2) the required prejudice showing under Brady; (3) the trial

19   court's failure to grant change of venue; and (4) insufficiency of the evidence to support

20   Petitioner's murder conviction. (ECF No. 1.) Respondent filed an answer. (ECF No. 59.) To

21   date, no traverse has been filed, and the time for doing so has passed.

**II.**

**STATEMENT OF FACTS[4]**

***PROSECUTION EVIDENCE***

---

[2] "LD" refers to the documents lodged by Respondent. (ECF No. 58.)
[3] Page numbers refer to the ECF page numbers stamped at the top of the page.
[4] The Court relies on the California Court of Appeal's August 27, 2014 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009). The Court relies on Petitioner's state habeas petition docketed by the California Supreme Court on May 13, 2021, for the summary of the facts following discovery of the victim's body. (ECF No. 58-55.)

Deborah Triantis Hawk was last seen at her home during the evening of June 12, 2006. Although her blood was found in her home, law enforcement was unable to locate her body. Defendant was her ex-husband.

Defendant and Deborah's marriage produced three children: Conrad, Chelsa, and Savannah.[5] They lived in Lemoore in a house they built a short distance from defendant's parents' home on property owned by defendant's father.

In October 1997, defendant's father set up irrevocable trust accounts for each of the Hawk children. The accounts were funded with cash and securities. Originally, defendant and Deborah were cotrustees on the accounts.

In 1998, Deborah petitioned for dissolution of the marriage. The divorce was acrimonious. After divorce proceedings began, defendant's father set up a second irrevocable trust account for each child and stopped depositing money into the first set of accounts. Defendant was the sole trustee of the second set of trust accounts. The trust language provided that the funds were to be used "as the trustee reasonably determines is necessary" for the beneficiary's "health, education, support or maintenance."[6]

In addition to the money put into the children's trust accounts, defendant's parents also gave defendant up to $20,000 a year. That amount was determined by the stock market.

In March 2000, a judgment of dissolution was entered. The property issues (primarily involving division of the family home) remained unresolved.

Mary Royer ran an in-home day care and provided such care for the three Hawk children. She also had three children of her own. In October 2000, after dating defendant for a year, she moved into the Hawk family home with him.[7] Royer was going through a divorce at the time and giving swim lessons at her family's swim school. Early in the relationship, defendant commented to Royer that there was not enough punishment in the world for all the crimes Deborah had committed against him. Defendant perceived Deborah as hurting him and taking his children away. There were also times defendant would be upset about child support matters and Royer would try to talk him through it.

As cotrustee on the first set of trust accounts, Deborah continued to receive duplicate statements for them. Deborah's father, William Triantis, saw the statements and noted that money had been withdrawn.

In October 2000, Deborah sought a modification of visitation, child support, and attorney fees and costs. In her motion, she requested that defendant be removed as trustee of the children's accounts, the stolen money be returned, and Mary Royer be ejected from the family residence.

Defendant was unemployed for a period of time between 1999 and October 2000. In the summer of 2000, he got a job with the Central California Almond Growers

---

[5] For clarity, we refer to Deborah and the children by their first names. No disrespect is intended.

[6] Because the trusts were irrevocable, defendant's parents had no control over the trust assets. Defendant, his parents, and other members of the family all told the children the money was for their education. During Conrad's freshman year in high school, he asked defendant about the money for his college. Defendant was irritated by the inquiry.

[7] Royer's three children lived in the Hawk home every other week until 2003, when her daughter went to live with Royer's ex-husband.

Association. Defendant left that job in the spring of 2001 and remained unemployed through November 2005. Royer testified that, at one point, defendant purchased a domain name (BuyNuts.com) with the objective of starting an on-line nut company.[8] Royer stated she and defendant lived primarily on deposits defendant made into their joint checking account. Royer understood the deposits came from defendant's investments.

Deborah's motion for modification was heard November 6, 2000. Defendant conceded he had removed $500 from each of the children's accounts, but claimed he had used the money to pay the medical expenses of Chelsa's appendectomy. Deborah disputed this as Healthy Children, a state program, had paid the bill. On January 8, 2001, the court ordered defendant removed as trustee of the accounts and ordered him to reimburse the money with interest.

On January 24, 2001, a stipulated order was entered covering the outstanding property issues of the marital dissolution. The order provided that defendant pay $45,000 to Deborah forthwith, transfer and divide certain stocks, and pay Deborah's attorney fees and costs.

Deborah and the children were renting an apartment. In 2001, Deborah purchased a home in Hanford. That is the home she and the children were living in when she disappeared. On several occasions, when Conrad said something about the Hanford house, defendant responded, "yeah, that's my house. I paid for it." Defendant also regularly made comments to Conrad about how "your mother split our family up. Your mother ruined our family" or "we're not going to let her destroy our family anymore. She's done her damage."[9] Conrad observed that defendant felt "extreme hatred" toward Deborah.

In June 2001, the Department of Child Support Services (DCSS) opened a file relating to defendant and Deborah. Defendant did not pay child support on a regular basis. When he worked for his father, his wages were garnished. In July 2002, a contempt hearing was held. Defendant was approximately 14 months—$7,400—in arrears.

Royer went back to school to obtain her teaching credential. While she was commuting between Lemoore and Fresno State, she drove a large Suburban. She and defendant decided she needed a smaller car with better gas mileage. Defendant purchased a Lexus for a little over $20,000. Although only his name was on the title, he told Royer it was her graduation present. Defendant asked the salesman to hold the check for a bit because he needed to transfer some money. Around this period of time, defendant and Royer took Royer's two sons and defendant's children on a trip to Las Vegas. Royer obtained her teaching credential in 2004.

In April 2004, defendant filed an application for a mortgage loan in the amount of $201,000 to refinance the existing mortgage on his property in Lemoore. The amount owed on the existing mortgage was approximately $165,000. The lending institution required pay stubs and tax returns for 2003 and a fictitious business name statement to verify defendant was not self-employed. Defendant provided a fictitious business name statement for BuyNuts.com. The entity was listed as a

---

[8] According to Royer, defendant never actually put up the Web site. He did some research into shipping costs and brokers for the nuts, but never located any brokers or bought any nuts to sell.

[9] Deborah also said negative things about defendant, but her comments were usually made in more of a joking, sarcastic manner.

corporation; the registrants were listed as Conrad Hawk, Chelsa Hawk, and Savannah Hawk, and the fictitious business name statement purported to be signed by Conrad. The pay stub provided showed an income of just under $2,100 for the period of April 1 to April 15, 2004, and the income tax return reflected a 2003 BuyNuts.com income of $48,000. Loan company records documented that one of its employees called the business and spoke with "Conrad," who was listed as the supervisor, who provided verbal verification of defendant's employment.

Conrad denied any involvement with BuyNuts.com, ever employing defendant, or ever speaking to anyone over the phone inquiring about BuyNuts.com. Shown the fictitious business name statement, Conrad stated he did not recall signing it, the writing did not look like his writing, but looked "pretty similar" to defendant's handwriting.

In March 2005, defendant and Royer went on a trip to Hawaii; the trip was defendant's Christmas present to Royer. Later that month, defendant told Royer he was out of money. Royer's mother then paid their bills, and Royer paid her mother back out of her earnings at the swim school.

Royer believed this was about the time defendant began working for his father, planting and bringing an almond orchard to production. After child support was deducted, the job netted defendant $213 per month. Defendant and Royer looked for a way defendant would not have to pay his child support, based on his income versus what Deborah was making at the time.

In November 2005, defendant approached DCSS and requested a modification of child support, due to his belief Deborah's earnings were greater than his.[10] At the time, defendant was approximately $5,593 in arrears. DCSS's calculation, based on the information defendant provided, showed defendant's child support would decrease.[11] That same month, Royer moved into an apartment in Lemoore and stopped seeing defendant.

In December 2005, Deborah retained attorney L. Kim Aguirre to file a motion to modify child custody and child support. There were issues regarding arrearages and a question concerning whether accounts had been maintained properly in light of defendant's 2001 withdrawals. Aguirre was aware defendant had made a request to DCSS to consider a child support modification. An order to show cause was filed December 15, 2005, for a court date of January 17, 2006.

Defendant was served with the papers at his home on December 28, 2005. Royer was present. Defendant was tense, visibly uneasy, and said he had to go back to court. Royer told an investigator that defendant said "it won't be over until that fucking bitch is dead." Although Royer told the investigator defendant said this "over and over and over," she testified defendant only said "something to that [e]ffect" three or four times over the five years she and defendant were together. It was what defendant would say when he and Deborah were in conflict over the children. Royer also told an investigator defendant seemed "really, really angry"; that defendant saw Deborah as a machine gun, shooting at him all the time, trying

---

[10] While DCSS does not represent either party in court, it will collect income verification from them, run a calculation based on income and visitation, and obtain a child support amount. The parties can then either agree to an amount or DCSS will obtain a court date for the matter. Once the parties obtain attorneys, DCSS's involvement in the case ends.

[11] Although Royer never saw the actual support calculation, defendant said that, based on their respective incomes, Deborah would have to pay him.

to wear him down, "just constant, constant, constant, constant, constant," never going to leave him alone. Royer testified, however, that defendant felt positive about the outcome of the court case.

On January 17, 2006, defendant's attorney filed a response asking for increased custody and decreased child support.[12] The original hearing date was continued to allow mediation of the child custody issue.

Conrad was scheduled to meet with the family law court mediator in late 2005. Prior to the date of that scheduled meeting, defendant drove Conrad and Chelsa to Hanford High School for the purpose of dropping Chelsa off for a volleyball practice. After doing that, defendant pulled into a location where nobody was around. Defendant was in the driver's seat and Conrad was in the back seat. Defendant turned around and, with his face 12 to 18 inches from Conrad, started screaming that Deborah was an evil, horrible, terrible person; and asked if Conrad understood Deborah was trying to ruin his life, steal his home, and put his parents out on the street. Defendant said Conrad was also an evil person, defendant was disgusted with him, and Conrad "was damn lucky [defendant] wasn't back there right now ripping [Conrad] a new asshole." Defendant demanded that Conrad tell the mediator he wanted to live with each parent "50/50." Three times Conrad said "okay," only to have defendant say he was not satisfied and demand that Conrad convince him. When Conrad promised to say he wanted it 50/50, defendant thanked him and they drove home. Once home, defendant told Conrad he had failed as a father because he was raising a "horrible despicable human being," although that was not completely his fault because Deborah had "a part to do with that." Defendant also said people at church were disgusted with Conrad and had noticed flaws in his character. Defendant said the people at church loved Chelsa, but found Conrad despicable and asked why Conrad could not be more like Chelsa. Defendant said Conrad used to be a "good kid" and asked "[w]here did [Conrad] go wrong?" Defendant said that if Conrad told the mediator he wanted 50/50, things could change. Defendant said Conrad could get a new vehicle, a new computer, and could remodel his room any way he wanted. Conrad, who was shaken by the entire incident, said it sounded great and he would tell the mediator custody should be 50/50.

Defendant and Deborah were each required to file an income and expense declaration under penalty of perjury. Defendant attached a copy of his 2004 tax return to his declaration. In that tax return, defendant listed his total yearly income as $6,000 and his mortgage interest paid as $13,173. In the declaration, defendant listed his prior month's income, and his average monthly income, as $500. Defendant further represented that he paid for living expenses with savings, the proceeds from the home refinancing, and gifts from parents.

Due to the discrepancy between the stated income and the amount of mortgage interest paid, Aguirre subpoenaed records from defendant's bank accounts, from Morgan Stanley (for defendant's accounts and the children's trust accounts), and from defendant's employer (his father) showing his wages.

In response, defendant's attorney filed a motion to quash the subpoena on Morgan Stanley and on defendant's father. In the supporting declaration to the motion to quash, defendant, under penalty of perjury, claimed the subpoenas were issued solely to harass him and his family. He declared he was voluntarily producing the

---

[12] Further unspecified dates in the statement of facts are to dates in 2006.

last five years of tax returns and W–2's,[13] he had established the trust for the children, the trust was revocable, and the trust was not discoverable because it was protected by attorney-client privilege.

Despite the motion to quash, Morgan Stanley provided Aguirre with the requested records. The records disclosed defendant had taken thousands of dollars from the children's trust accounts. Aguirre provided the Morgan Stanley information to defendant's attorney.

Aguirre believed that, as the trustee of the accounts, defendant owed a fiduciary duty to maintain the funds for the children's benefit, and that use of the assets for his own benefit, or treating the assets as his own, violated that duty. Aguirre sought to produce evidence of the stolen money, and to request the court order defendant to return the money and pay support based on his lifestyle, not on the $6,000 per year income claimed in his 2004 tax return.

In April, DCSS garnished defendant's bank account and obtained just over $5,000. DCSS also continued to receive $213 per month from defendant's wages.

The motion to quash, originally set to be heard May 19, was continued until July. Deborah was last seen June 12. Due to her disappearance, the motion and the post judgment support issue were never heard.[14]

The children spent every other weekend, from Thursday after school to Monday or Tuesday night after school, at defendant's house.[15] The second weekend in June was one of those weekends. On Thursday evening, June 8, defendant seemed to Conrad to have a lot on his mind. Meals with defendant were usually conversational but, this time, there was not much talk at dinner, even though Conrad tried to make conversation.

On Friday, June 9, because of his final examination schedule, Conrad got out of school shortly after noon. Defendant could not pick him up right away, so Conrad went to Deborah's house.[16] On that same day, Deborah had lunch with Michael Ray, a longtime friend.[17] That evening, Conrad went to the Hanford High School graduation. Conrad planned to have friends drive him back to Deborah's house after the graduation where defendant would pick him up. Before leaving Deborah's house for the graduation, Conrad hid his copy of the key to her house under the door mat. He "look[ed] around" before placing the key under the mat, but did not see anyone. Conrad ended up riding back to Deborah's house with Deborah. When they arrived at the house, they went inside and forgot to retrieve the key. Conrad had telephoned defendant while still at the high school and asked defendant to pick him up at Deborah's house. Defendant did so about 15 to 30 minutes after the phone call.

---

[13] According to the tax returns produced by defendant, his taxable income in 2001 was $38,277. In 2002, he had no taxable income, but a mortgage interest deduction of $14,253. In 2003, he had no taxable income and a mortgage interest deduction of $14,030. In 2005, he had a taxable income of $6,000 and a mortgage interest deduction of $11,492.

[14] The fact Deborah disappeared did not, however, prevent someone, acting on behalf of the children, from filing a petition in court to litigate the trust matter. Moreover, the children themselves had a certain amount of time after reaching the age of 18, to pursue an action.

[15] As previously stated, defendant lived in Lemoore and Deborah lived in Hanford.

[16] Conrad was 15 at the time and unable to drive.

[17] Ray and Deborah were intimate for six months somewhere around 2004 or 2005. As of June 2006, they were very close friends. Deborah was not dating anyone in particular at the time she went missing.

On Saturday evening, June 10, Deborah and Ray attended a wedding together. On Sunday, June 11, they went to a birthday party at the home of Ray's sister. They left the party around 3:30 or 4:00 p.m. They parted ways and Ray went to work. Ray did not see Deborah after that. On Monday afternoon, June 12, Deborah left Ray a voice mail about an upcoming concert.

Defendant volunteered at Royer's swim school during the summer months, and was there almost every day. Royer recalled defendant being at the swim school on Monday, June 12. Because it was the start of a new class session, the day was extremely busy. Chelsa believed she went to the swim school with defendant that day. Savannah, who was 10 at the time, was at defendant's house.

Around 3:30 that afternoon, Norman Gassaway, who lived in Hanford, discovered the rear license plate was missing from his vehicle. Gassaway last specifically recalled seeing the plate on the vehicle the preceding Thursday, June 8. He immediately reported the theft.

During that afternoon, Deborah took Conrad to a doctor's appointment. Early in the day, Deborah telephoned Conrad to make plans to take him out to lunch prior to the appointment since Conrad was at defendant's house alone. Conrad telephoned defendant to ask if he could go. Defendant said "no your mother needs a taste of her own medicine. She needs to know what it's like." As a result, Deborah picked Conrad up around 3:45 p.m. She was driving her company's minivan.[18]

After the doctor's appointment, Deborah took Conrad to fill a prescription, rent a movie, and then to her house. Around 7:00 to 7:30 p.m., Deborah took Conrad back to defendant's house. Deborah had no plans for the evening other than to watch the movie she had rented. That was the last time Conrad saw his mother.

That same night, Chelsa attended a party. Chelsa recalled the party ending around 10:00 or 10:30 p.m. She telephoned defendant when it started wrapping up. He said he would be there in 15 or 20 minutes, and she decided to call her mother before it got too late. She called Deborah at 10:34 p.m. and talked to her for 10 to 15 minutes. Deborah sounded normal and relaxed, and was close to going to bed. Defendant arrived just as they finished talking. This was somewhere around 10:45 p.m. Defendant talked to the parents of the girl giving the party for a couple of minutes, and then he and Chelsa went straight to his house. There was nothing unusual about the way defendant was acting. Chelsa believed he went straight to bed when they got home, because he habitually went to bed early. Chelsa showered and then watched television until she fell asleep sometime between 11:00 p.m. and midnight.

Savannah was at defendant's house that evening. She recalled defendant leaving to pick Chelsa up around 10:00 p.m. Savannah went to bed right when he left. Savannah slept through the night and did not hear Chelsa (with whom she shared a room) and defendant come home.

Chelsa and Savannah's room was across the hall from defendant's room. Chelsa normally slept with the door and windows open. Defendant's house had a long, gravel driveway; when he came home, defendant would back his car into the garage and shut the garage door. The automatic garage door opener made a lot of noise. Chelsa, who described herself as a "very light sleeper" who did not always

---

[18] Deborah was a pharmaceutical sales representative. Although the van was a company vehicle, she often used it as her personal transportation.

sleep the whole night through, did not hear defendant leave that night. She never heard the garage door open or the car start up, and it was defendant who woke her the next morning. She had been there before when defendant left and had always heard him.[19]

Taryn Maltes and Deborah were close friends. They spoke by phone around 7:30 p.m. on June 12, with the conversation ending around 8:00 or 8:15 p.m. Deborah sounded tired and wanted to relax that night and watch a movie. Maltes made arrangements to call Deborah the next morning, after a job interview. That was Maltes' last conversation with Deborah; she called Deborah around 10:00 a.m. on Tuesday, June 13, but the call went straight to voice mail. Maltes tried reaching Deborah about three or four times up until around 6:00 p.m. Deborah never answered or returned a call.

Tiffany Jones and Deborah were next-door neighbors. Jones last saw Deborah around 7:50 p.m. on June 12. Deborah was in her front yard, looking at her flowers. She was wearing a long dress and looked nice. She then got into her van and left. Nobody was with her. Jones did not see Deborah return home.

Deborah had a close relationship with her father, who lived in Walnut Creek. For years, they spoke almost every night and saw each other every other weekend or so. On June 12, Deborah and her father spoke by phone for at least half an hour around 9:30 or 9:45 p.m. Deborah sounded in good spirits, but was tired and had to go to bed. She usually would watch part of a movie and fall asleep while doing so. That was his last conversation with her.

Deborah's employer provided its employees with a voice mailbox and telephone voice mail system. The voice mailbox required a password for access. Each employee set his or her own password. Deborah's voice mailbox was accessed for one minute, using a password, at 11:29 p.m.

Several people who lived near Deborah's house heard one or more screams in the early morning hours of June 13. Jones, who estimated the time as being around 1:15 or 1:20 a.m., described a high-pitched scream that lasted two seconds, followed by a high-pitched, shrieking scream that lasted about three seconds. The screams sounded like they came from the direction of Deborah's house.[20]

Sarah Hodson estimated the time as being around 2:00 a.m. She described a loud yell that lasted one or two seconds that made her nervous. It came from the west, which was in the direction of Deborah's house.

Janet Hughes estimated the time as being around 2:00 or 2:15 a.m. She described

---

[19] According to Conrad, one could readily gain access to the roof of the garage by going out one of the windows in defendant's bedroom. That window was supposed to have a screen, but the screen was not always in place. A photograph taken in June 2006 showed the screen off the window.

[20] Jones had once noticed Deborah had a habit of leaving her windows open at night, and had warned her against sleeping with them open. According to Savannah, however, Deborah would check all the doors and windows. Only occasionally would the windows in Deborah's bedroom be open at night. According to Chelsa, Deborah would normally go around and lock the doors and windows at night. According to Conrad, the doors were kept locked and the windows usually were locked. Even on occasions when the windows were left open, all the windows had "stoppers" that prevented them from being opened more than eight to 10 inches.

hearing loud screaming sounds that were "very eerie," "definitely a living thing that sounded as if it was being killed." It sounded like an uncontrolled scream that came from "deep within." It then stopped abruptly mid-scream. Hughes believed she heard two or three segments of screaming, with about five seconds in each scream. She could not tell the screams' location.
No one heard gunshots or called the police.[21]

On the morning of June 13, defendant woke Chelsa around 7:30 or 8:00. Chelsa planned to return to the swim school until it was time for the children to return to Deborah's home. Defendant dressed in shorts and a short-sleeved shirt. Neither Royer nor Chelsa noticed any scratches or bruises on defendant. They did not notice anything unusual about the way he acted.

Deborah was scheduled to pick up the children from defendant's home at 5:45 that evening. The plan was for her to drop Chelsa and Conrad off at a swim meet at Lemoore High School and take Savannah out to dinner. When Deborah did not arrive at the appointed time, Conrad called both her cell and house phones, but received no answer. At 6:00 p.m., the children again called, but both phones went to voice mail. The children continued to call for about 40 minutes, without success. The children grew concerned, as this was unusual.

Defendant offered to take the children to Deborah's house. Neither Savannah nor Chelsa felt he was acting strangely. He was slightly annoyed or irritated that he had to take the children home when Deborah was supposed to pick them up, but given his and Deborah's relationship, it would have been strange had he not been irritated. Conrad, on the other hand, found it unusual that defendant volunteered to take them; usually this would have been another opportunity for defendant to say something like, "what does your mother think she is ... [s]he can't come and go whenever she wants."

Defendant and the children left defendant's home around 7:00 p.m. When they arrived at Deborah's home, Conrad recalled them saying good-bye to defendant, walking up to the door, getting the key from under the mat, and going inside. Savannah and Chelsa recalled waiting in the car or getting their belongings out of the trunk while Conrad went in the backyard to get Conrad's spare key.[22] Once the children were in the house, defendant drove off, just as he usually did when returning them after visitation.

According to Chelsa, defendant had only been inside Deborah's house once, when he had fixed the computer in the living room, which was the computer the children used. A month or two before Deborah's disappearance, however, Savannah twice saw him driving by and taking pictures of the house. One of these occasions was toward the end of the school year.

Once inside the house, the children noticed the drawers of a desk in the living room were open and papers had been gone through. Although Conrad's room and the room Savannah and Chelsa shared were normal, the desk in Deborah's bedroom office had been ransacked. There was blood in the hallway, on the floor next to Deborah's bed, and on the side of the bed on which she slept. A chair in the bedroom and the decorative bed pillows were out of place; the bed was made, but not to Deborah's standards. In addition, the pillow on which Deborah slept

---

[21] Hughes had not been aware of there being any kind of significant crime in the neighborhood.

[22] Each of the children had a key to the house. Savannah kept hers in her school backpack; on this particular weekend, Savannah had left her backpack at Deborah's home. Chelsa kept hers in her backpack or purse.

was tossed in the corner instead of being on the bed.[23]

The sliding glass door and screen in the living room were open, but the vertical blinds were shut. Deborah had a rule that if the glass door was open, the blinds also had to be open; in addition, the door and screen would not normally both be open because bugs would come in if they were. When they went to bed at night, the sliding door and the screen door were closed and locked.

There was blood in the kitchen, the laundry room, and in the garage. Deborah's company's van was missing.

The children searched for Deborah, but she was not in the house or out back. The family cat was also missing.[24]

Conrad called the police, who responded almost immediately.[25] The police found bloodstains on the carpet in the entrance to the master bedroom and on the comforter/bedspread. A large bloodstain was found on the carpet at the foot of the bed, and what appeared to be a smear mark of blood arced around a decorative basket. There were pillows on the floor, and the bed sheet was hanging out from underneath the comforter. When the comforter was pulled back, the top sheet had a misting of blood on it. There was no blood or semen on the fitted sheet.

In the bedroom office, a computer, printer, and various items were on top of the desk. There were items on the floor adjacent to the doorway. A drawer had been pulled out of the desk. The paperwork that was scattered on the top of the desk included account summaries for Deborah's retirement account, and the first set of children's trust funds.

There were bloodstains and smears on the tile in the laundry room, with a smear leading to the threshold of the doorway into the garage, and blood spatter and stains on the dryer. Inside the garage, a smear that appeared to be a drag mark of some type led between a metal shelf and a vehicle that was parked in the garage, and terminated near the rear tire of the vehicle.[26]

Although there was jewelry and cash in the home (a diamond bracelet, diamond ring, and watch lying on the bedroom armoire, and an approximate total of $500 in various locations), no valuables appeared to be missing. Presents Chelsa received for graduating from eighth grade, which included a necklace and money, were all still on the living room floor. The small fire box in which Deborah kept financial records was also still there. Deborah's cell phone was there, but her purse and keys were missing.

There were no signs of forced entry at the residence. The overall neatness of the home, selective rummaging, as opposed to generalized ransacking, and the

---

[23] According to Savannah, Deborah's bed was always made a particular way. Similarly, the bedroom office was also kept neat. Deborah would not have had papers strewn across the bedroom office floor and desk, nor leave a desk drawer open.

[24] Like Deborah, it was never found.

[25] The children did not call defendant. Chelsa knew he was driving and did not know if he had his cell phone with him. Chelsa chose to go to "whoever was closest," so she and Savannah went to the neighbors' house. Conrad considered calling defendant, but did not feel comfortable doing so and called 911. When the police arrived, they told the children not to contact defendant, they would talk to him first.

[26] This was a vehicle purchased by the children's grandparents. Conrad was learning to drive and was not permitted to drive the company van.

11

presence of items normally taken in burglaries (jewelry, television set, laptops, etc.), were inconsistent with a typical burglary scene.[27]

At approximately 2:20 a.m. on June 14, Detective Matteson of the Hanford Police Department telephoned defendant. After identifying himself, and without saying why he was calling, Matteson asked defendant to come down to the police department to speak with him. Defendant did not ask why Matteson was calling nor ask about his ex-wife or children. Defendant asked if it was absolutely necessary that he come right then. When Matteson said it was important and requested again that he come down right away, defendant agreed. Defendant still did not ask why, or inquire about the children or Deborah.

Because Matteson was in the back speaking with other officers about the case, he did not go to the lobby to contact defendant when he arrived. Defendant approached Cambria Gomez, a dispatcher, and, when asked what he needed, said somebody had told him to come down to the station. He did not give the person's name. Gomez obtained defendant's name, told him to have a seat, and contacted investigations. From her location in the dispatch center, Gomez could see defendant; he stood close to the dispatch center window and glared at the dispatchers for about 10 minutes. After asking Gomez how long it was going to be and being told it would be a couple more minutes, defendant waited about 10 minutes, paced back and forth for two or three minutes, and then left. At no time did he ask Gomez why he was there, or ask about his children or ex-wife.

Defendant was subsequently stopped, and Matteson contacted him at the traffic stop. Matteson told defendant that Deborah was missing. Defendant did not ask about his children. Told Matteson wanted to talk to him at the station, defendant returned to the station. Defendant was interviewed for about 90 minutes. Early in the interview, which, unlike Matteson's contact with defendant at the traffic stop, was being recorded, defendant asked where the children were.[28] Asked for consent to search his residence and vehicle, defendant agreed. At his house, however, defendant asked what would happen if he did not agree. Matteson responded that they then would not search. Defendant allowed them to go ahead.

---

[27] As set forth previously, Deborah worked for a pharmaceutical company. According to Trish Estabrook, Deborah's supervisor, Deborah had a list of prescribers (doctors) on whom she was required to call. While in their offices, she would check their sample closets and, based on the medications she carried, supply those offices with samples. Deborah carried samples of Asmanex, an asthma medication; Nasonex, a nasal steroid; Proventil HFA; and various forms of Clarinex, a decongestant. None of the medications would produce a high, even if taken in quantities. Although some forms of the Clarinex contained pseudoephedrine, one of the components of methamphetamine, none of the company's representatives received enough in a shipment to develop any type of drug that would be deemed unsafe or addictive. All of the company's representatives had storage units and normally only carried enough samples for two or three days. Estabrook had been a manager of sales representatives for more than 11 years as of the time of trial. She had never known anyone to have their home, storage unit, or vehicle broken into and samples stolen.

According to Savannah, Deborah kept pharmaceuticals in two locked cabinets in the garage. The key was kept on top of the microwave. Savannah had no idea whether it was still there. According to Chelsa, Deborah sometimes had actual samples like inhalers and a few other things. Usually the "samples" were pens or pamphlets or little gadgets. She had boxes or storage bins of these things in the van. She did not know if any of the samples kept in the garage cabinets were missing after Deborah disappeared. According to Conrad, Deborah did not keep drug samples around the house with her current job. At the time she disappeared, those kinds of samples were kept in a storage locker. The things kept at home were items like pens that had the company logo and name on them.

[28] Upon seeing Conrad later that morning, defendant told him to get in defendant's car. Defendant did not hug Conrad, ask how he was doing, or make any reference to Deborah.

Nothing seized from defendant's house or vehicle had blood on it, except for a pair of Chelsa's pants that had a small drop of Chelsa's blood.

Later that morning, defendant went to the swim school. He had telephoned Royer that morning and said he was going to be late because he had some things he needed to take care of. Although he was no more than half an hour late, she was already in the pool by the time he arrived and did not have a chance to talk to him. Later that afternoon, Royer learned from a television news report that Deborah was missing.

Also on June 14, Criminalist Kenneth Penner and Latent Print Analyst Richard Kinney, from the California Department of Justice (DOJ) crime laboratory in Fresno, responded to Deborah's house for collection of DNA evidence and fingerprints. The DNA profile from the bloodstains in the house and garage was consistent with that of Deborah, while defendant and the children were excluded as possible sources.[29] All usable prints in the house belonged to Conrad and Savannah.[30] A usable, unidentifiable print was found on the right hood of the car in the garage. None of the prints in the house matched defendant.

The children ended up at defendant's house the night of June 14. Royer was also present. Defendant and Royer spent most of the evening out on the patio. Conrad saw them drinking wine and toasting something.

A day or two after Deborah disappeared, her parents came down to the Lemoore area from Walnut Creek and were invited to go to dinner with defendant and the children. At trial, Chelsa testified she recalled defendant saying encouraging things, like he hoped Deborah would be found and he hoped for the best outcome. When Matteson interviewed Chelsa in Walnut Creek on July 10, however, Chelsa related that after the Triantises left following dinner, defendant said something to the effect of, "see now that your mom's not here we can all get along better. She was part of the problem," "[i]t was tense when she was around," and that kind of thing.

The police located Deborah's van on June 15, on Byrd Street between Kirk Street and Lily, in the area of Jensen Avenue and Highway 41 in Fresno. Two days earlier, between 2:00 and 5:00 a.m., Maria Jasso, who lived in the 2500 block of South Lily, heard her dog running around the fence, barking and scratching like he wanted to get out. This was unusual behavior for the dog. Although her dog's behavior went on for 10 or 15 minutes, Jasso merely went back to sleep.

Jasso left the house around 8:00 that morning following her dog's noted behavior. She did not notice anything unusual. When she returned about 3:00 or 4:00 that afternoon, however, she saw a minivan parked on the side of the street by her house, around the same place the dog had been barking.[31] Because it was not unusual to see vehicles there, Jasso did nothing.

The next morning, the vehicle was still there. When it had not been moved late that afternoon, Jasso called the Fresno Police Department. They did not come because they said the vehicle had not been reported lost or stolen.

---

[29] The Saturday after Deborah disappeared, defendant and the children voluntarily provided fingerprints and DNA samples for exclusion purposes. Defendant also cooperated with the police in obtaining his cell phone records.

[30] None of the documents found in the house were processed for prints, although it is possible to get fingerprints off of paper.

[31] Jasso's husband noticed the van there when he left for work around 5:00 or 6:00 that morning.

The third morning, the vehicle was still there. Jasso's husband looked inside and reported there was blood in the van and the keys were in the ignition switch. Jasso called the police again. This time, they came.

The van was missing its front license plate, although the dirt made an outline of the license plate number on the bumper. The driver's window was down. A key was in the ignition; it was the only key on the key ring.[32] The passenger side window was also rolled down. The glove box was open and empty, with no vehicle registration or insurance paperwork. There was some change and a pink piece of possibly phone message paper in the ashtray. Dirt and fox tails were visible on the floor of the van. There was also blood visible on the rear bench seat, floor, and threshold of the sliding door. The license plate from Gassaway's vehicle was on the back of the van. There was a lot of white sandy dirt on the wheel wells, tire tread, bumper, and windshield wipers, as well as on the undercarriage. The crossbar of the undercarriage looked like perhaps the van was going off road and hit something. Deborah's plastic sample container and anything related to her employer had been removed.

Penner subsequently examined the van for the presence of blood or other trace evidence. Although he did not observe any blood on the steering wheel, he tested different locations for the possible presence of trace DNA from whoever handled the steering wheel. He did not recover sufficient DNA for DNA typing. The DNA profile recovered from each of the blood stains inside the van was consistent with that of Deborah, while defendant and the three children were excluded as possible sources.

Kinney processed the van, including the key, key chain, and license plate, for fingerprints. Chelsa's prints were found inside and on the exterior of the vehicle. A print on the passenger side window could not be excluded as belonging to Michael Ray. A total of five usable, unidentifiable prints were found: three on the outside of the tailgate, and two, which were fingers and were left at the same time, on the inside of the front passenger window. These fingerprints faced down, meaning whoever left them was on the outside looking in. None of the prints matched defendant. No trace evidence linked to defendant was found in the van.

The Saturday after Deborah disappeared, Conrad was watching the morning news when defendant came into the room and asked, "[S]ince when do you watch the news[?]" When Conrad said, "since mom went missing," defendant rolled his eyes and "kind of scoffed," and walked out of the room.

Conrad was supposed to help hand out missing person fliers at the Hanford Mall that day, and defendant was going to drop him off. As they drove up, however, they noticed a news van parked in front of one of the stores. Defendant abruptly stopped the car, pointed at the news van, and asked, "[W]hat the hell is that[?]" He then told Conrad to sit down and shut up, that they were going home. They then "sped home pretty fast like the news van was going to chase [them] or something." Defendant, who was angry, said Conrad had lied and never mentioned there would be a news van there. However, Conrad had not known there was going to be a news van there.

Around 7:30 a.m. on June 24, a search warrant was executed at defendant's residence. Defendant was dressed and appeared to be ready for the day. Conrad,

---

[32] Deborah usually carried multiple keys on her key ring.

14

Chelsa, and Savannah were all asleep upstairs, despite the entry of a number of officers into the house. Chelsa's bedroom door was open, and Matteson woke her by knocking on the door, and patting her. Savannah was asleep in defendant's bed; Matteson woke her by touching and shaking her. Conrad was in his room with the door shut. He started to wake when Matteson knocked on the door.

Several computers were seized from the home. A forensic analysis of the main desktop computer showed a user account created in defendant's name. The computer contained e-mails from Deborah to defendant. One, dated May 23, informed defendant of an upcoming vacation Deborah and the children were taking to Washington, D.C. There were also two e-mails regarding the purchase of a stun gun. One was an order; the other, an order confirmation. The order showed a purchase, on May 3, of a stun gun for $75.95. The item was to be shipped and billed to defendant at his home address.

Firearms were also seized during the search. There was one semiautomatic handgun with a magazine in a holster, four shotguns, a rifle, and a pellet gun. They were kept in a gun cabinet in the master bedroom. All were unloaded, with the ammunition kept separate from the guns themselves.

During the June 24 search, Matteson observed the exterior of defendant's home. An aluminum extension ladder was lying on the ground in the back of the house, outside the garage. The ladder easily would have reached the garage roof. Defendant's Suburban, which was parked in the garage, was processed as part of the search. The search located no vegetation or sand.

As of June, Keith Marshall (Royer's ex-brother-in-law) and defendant were best friends. Marshall found out about Deborah's disappearance while out of town on June 18. He was told by his ex-wife. Defendant never called him. Instead, Marshall called defendant when Marshall got back into town. Given their relationship, Marshall would have expected a phone call from defendant.

After the police seized defendant's firearms, Marshall and defendant had a conversation. Marshall suggested that whoever did it could come back and "take [defendant] out."[33] Believing there was an issue regarding defendant's personal security, Marshall offered defendant a handgun for protection. Defendant said he did not need anything, but did not mention he had purchased a stun gun. Given the closeness of their relationship, Marshall would have thought defendant would have mentioned the stun gun. Defendant's failure to do so was one reason Marshall later agreed to wear a wire.

During the conversations with Marshall, defendant commented that the police did not search his house well, because, they did not take his work boots although they took all his other shoes. Defendant asked, "You know if I'm gonna go dispose of a dead body somewhere wouldn't I wear my work boots because they're more durable?" When Marshall suggested that someone disposing of a body would not leave anything or bring anything back to the house, defendant responded, "Well I'm pretty naïve. All I do is turn the hose on it and they'll never be able to figure it out right?" Later, defendant told Marshall he did not think the authorities could find Deborah, because the rivers were too full, the fields too big, and the dumpsters too many. Defendant said that if someone threw a body off a bridge "in

---

[33] Marshall was concerned that "things were being staged" and media "brought in," and the focus was on defendant even though he had not been named as a suspect.

this kind of water, this time of year," it could be anywhere, and at some point it would start to decompose and break apart. When the water went down, something would be found. Defendant also said: "I tell you what if I was a bad guy I'd go throw somebody off a bridge. That's what I'd do believe it or not. I'd toss em in and, and they'd float down stream and they'd go away." When Marshall pointed out that the canals in the area did not flow that fast, defendant responded that the rivers did, and that there were all sorts of wildlife. Discussing a particular portion of the Kings River, defendant stated: "All that vegetation on one side all that, it's almost like a delta. There is so much stuff. They'll never find a body[,] you can't go walking through that stuff. You can't get in there. Even with boats and jet ski's you couldn't, you couldn't [s]earch that whole area."

About a month after Deborah's disappearance, Conrad was watching a news report about the one-month anniversary of the disappearance, when defendant came into the room. When Conrad said he was feeling sad about Deborah disappearing, defendant said the girls had identified the problem, dealt with it, and moved on, and he asked why Conrad could not do the same. Conrad said he was trying, but it was tough. Conrad turned 16 that summer. At some point, defendant asked when he was going to get his driver's license. When Conrad said he did not know, as it was far down the list of things on his mind, defendant kind of scoffed and said they could not let "this little unfortunate set of circumstances" disrupt their lives or disrupt their daily routine.

On July 17, police again searched defendant's house. A couple of days later, Conrad saw an envelope in defendant's Suburban. It was from Harris Ranch, where Deborah worked before her divorce from defendant. It appeared to have something spilled on it, and was in a plastic zip-lock bag. When Conrad asked what it was, defendant said it was an envelope with blood on it. Conrad asked if they should give it to the proper authorities, but defendant said no, that the police were trying to frame him.

On July 20, Matteson served another search warrant on defendant's house. When informed Matteson was looking for the stun gun, defendant told him its location. The stun gun was found on some white clothing racks in the southwest closet of the master bedroom. Those racks had been searched on June 24. The stun gun was not present at that time. No wrist (safety) strap or holster was found.

Matteson did not test the stun gun to see if it worked. As purchased, however, the stun gun came with a safety strap that held a pin in the back side of the gun.[34] The stun gun was designed so that if the pin came out (for example, if the attacker took the stun gun away from the person using it defensively), the stun gun would no longer work.

The stun gun was submitted to the FBI for analysis. Although defendant's fingerprint was found on it, neither Deborah's DNA nor other physical evidence tying the stun gun to her was found.

During the July 20 search, Matteson also sought the Harris Ranch envelope. He found it in the Suburban, where Conrad said it would be.[35] Testing established the substance on the envelope was not, in fact, blood.

---

[34] In August, Matteson caused to be purchased, from the same manufacturer but a different Internet site, the stun gun purchased by defendant. It came with the wrist (safety) strap attached. It also came with a holster.
[35] By this time, Conrad's suspicions concerning defendant "were growing significantly."

16

Marshall wore a body wire in order to record his conversations with defendant.[36] During those conversations, defendant said he was home with his children when Deborah went missing, and on the night it happened, one of the girls had slept in the bed with him, and the other was playing a video game. Defendant explained he had gotten the stun gun because he wanted a means of protection for the house other than a gun. Defendant expressed concern that his daughters, or even Royer, did not have the sort of fortitude required to point a loaded firearm at an intruder and shoot. When Marshall asked if defendant ever told Royer or the girls about the stun gun, defendant said he had not, because the stun gun did not work. Defendant thought he might have inserted the batteries backward, or used dead batteries, but he had thrown away the packaging. Defendant expressed an inability to understand how the authorities were focusing in on him when they did not have any evidence. When Marshall told defendant they were going to charge him with murder, defendant asked how they could "have a murder without a body."

In July, the FBI obtained a number of defendant's financial records. Examination of the records showed:

- In August 2000, $500 was withdrawn from each of the original trust accounts, and $1,500 deposited into defendant's personal bank account. The records showed no payments for medical expenditures.

- In 2001, a total of $106,361.35 was withdrawn from the children's trust accounts, with $106,000 deposited into defendant's personal bank account and the remaining amount paid to Bank of America. Large portions of the money deposited into defendant's bank account were used to pay Deborah, her attorneys, and apparent bank and credit card debts.

- In 2002, a total of $53,612.88 was withdrawn from the children's trust accounts and deposited into defendant's personal bank account. In December 2002, following the withdrawal of more than $20,000 from the trust accounts and deposit of this money into defendant's bank account, defendant wrote checks for thousands of dollars to a bank, credit card company, mortgage company, and DCSS.

- In 2003, a total of $79,318.22 was withdrawn from the children's trust accounts and deposited into defendant's personal bank account. In March of that year, days after a withdrawal of $30,000 from the trust accounts and deposit of this money into defendant's bank account, a check for $26,465.64, made payable to Lexus of Bakersfield, cleared defendant's account. This check was for the Lexus defendant purchased for Royer as a graduation gift.

- In 2004, a total of $51,009.49 was withdrawn from the children's trust accounts and deposited into defendant's personal bank account.

- In 2005, a total of $23,250 was withdrawn from the children's trust accounts and deposited into defendant's personal bank account. On

---

[36] Marshall telephoned defendant on July 20 and met with him on July 21, although it appears the men had more conversations than just those two. It is not always clear from the record what conversation occurred when or what was discussed in each conversation.

Audio recordings of segments of the conversations were played for the jury, but not reported by the court reporter. The transcript of the recordings was not included in the clerk's transcript on appeal. Accordingly, we had the recordings and the transcript transmitted to us.

February 24 of that year, $6,000 was withdrawn from the trust accounts and deposited in defendant's personal bank account. From March 3 through 9 of that year, defendant's bank account showed four debit transactions in Hawaii that totaled approximately $575. According to Royer, defendant's Christmas gift to her was a vacation to Hawaii, which she and defendant took (without the children) in March 2005.

- During the first half of 2006, a total of $21,067.85 was withdrawn from the children's trust accounts and deposited into defendant's personal bank account.

Neither the Internal Revenue Service (IRS) nor the Franchise Tax Board (FTB) had income tax returns on file for defendant for the years 2001 through 2005, despite the fact defendant's income was such as to require they be filed.[37] FTB's accounting records showed no tax payments made in 2001 and 2003 through 2005, and one payment made in 2002. Because no tax returns were filed, the 2002 payment would have been an involuntary payment made when a lien was placed on property. During a property transaction, liens have to be satisfied before the transaction—such as a refinance of a house—could occur.

Defendant was arrested on May 29, 2008.

### DEFENSE EVIDENCE

Two computers were seized from Deborah's house—her work laptop, which belonged to her employer, and a desktop unit. Analysis of the computers showed that Internet dating Web sites were accessed on the desktop computer beginning in 2005. The last access was on the evening of June 4. Because the desktop unit was a shared computer, it could not be determined whether Deborah herself accessed any of the sites. In addition, it could only be determined that someone went to the sites, not that the person actually logged in. It was also impossible to tell whether there were e-mails between Deborah and anyone with whom she may have corresponded on the sites.

James Braun, a forensic accountant, reviewed the financial documents in this case. He also reviewed the trust agreements for the children's trusts. His analysis was hampered by the fact he did not have detailed information, such as cash register receipts, canceled checks, or credit card statements. Without purchase itemization, it was not always possible to ascertain what products were purchased and whether they could have been used for the children's benefit as specified by the trust agreements.

The language of the trust agreements expressly allows the trustee to " 'distribute to or for the use and benefit of the beneficiary' " so much of the trust's assets " 'as the trustee from time to time deems reasonably necessary for such beneficiary's health, education, support and maintenance.' " The language was very broad.[38]

Braun reviewed the various financial records in an attempt to determine where the money from the trust accounts went after it was placed into an account with other

---

[37] The purported income tax returns provided by defendant to the lending institution that refinanced his mortgage, and with respect to the action Aguirre handled for Deborah, were never filed with the IRS.

[38] "Support" meant assistance for the child and meeting what the child needed to "properly subsist." "Maintenance" meant maintaining the child's needs including food, shelter, clothing, school and school supplies, transportation, and medical care.

18

funds. Within the pertinent time frame, $296,180 from the trusts was deposited into bank accounts, together with $227,286 from other sources. Braun found more trust-related expenditures than there were deposits from the trust accounts.

Just because money went from the trusts into defendant's account did not necessarily make that money taxable to defendant. The money would be taxable to him as embezzled income, if a determination was made (for instance, in a criminal proceeding) that it was, in fact, embezzled. In Braun's opinion, defendant was guilty of commingling funds, but that did not automatically make him guilty of embezzlement. Such commingling, as well as failure to account for the various expenditures, constituted breaches by defendant of his fiduciary duties. However, Braun saw no effort to disguise what was going on, or to conceal where the money went, or any "sophisticated techniques."

With respect to the requirement defendant file personal income tax returns, Braun was hampered by the fact he did not have sufficient information concerning various stock sales. If the stock sales were completely omitted from the analysis, defendant would only have been required to file income tax returns in 2001, the year he had wages from Central California Almond Growers.[39] If the stock sales were included, and it was assumed defendant's basis was zero (which would be the worst case scenario and would mean all of his stocks were acquired for free), defendant would have been required to file income tax returns in 2001, 2002, and 2003, but not in 2004 and 2005.[40] In 2004 and 2005, defendant did not make enough to have filing requirements.

H. Ronald Sawl, an attorney, use-of-force expert, and firearms instructor, testified that a stun gun, which is a less-than-lethal device, is an "electronic immobilization device." It mimics the body's electrical system and sends confusing signals to the body. Although the voltage produced by a stun gun varies according to the device, all operate at three milliamps. It is this amperage that creates the immobilization, while the voltage allows the amperage to penetrate clothing or other layers of insulation to reach the nervous system. When someone is touched with a taser or stun gun, the amperage goes through the body, sending a mixture of signals to all of the body's voluntary muscles. Those muscles contract at the same time, disabling the person from being able to continue an attack, and depleting the body of all its stored energy, which takes the form of glucose, so that typically the person loses motor control and falls down. A stun gun does not knock a person out or impart an impact to the body. With prolonged stun gun exposure, the person may become disoriented, but does not lose consciousness. A person against whom a stun gun is used will sometimes be able to scream, although often there will be a grunt or involuntary sound. The recovery time is very quick: up to a couple of minutes in an unusual situation, but usually between three to five seconds. Because people have different physiologies and wear different types of clothing, 3 to 5 percent of the population is completely unaffected by stun guns.

Sawl explained that anyone can purchase a stun gun. There is no licensing, registration, or training requirement. Stun guns are a "very appropriate choice" for home protection, particularly in conjunction with a firearm. A loaded firearm is dangerous if improperly stored, and a stun gun can be readily available and can give a person confronting a threat time to gain access to a properly stored firearm. In addition, firearms are a poor choice for use inside a home because of the possibility the bullet will miss or overpenetrate the target and enter another room,

---

[39] If he had filed, defendant would have received both federal and state refunds.
[40] Again, defendant would have received a refund had he filed returns for those years.

striking an unintended victim. Also, while a child may misuse a stun gun or accidentally discharge it, the effects are not permanent.

Sawl, who owned a shooting range at which many stun guns were sold, had experienced situations in which the items did not arrive in operational order. He estimated that of the 30 to 35 a month purchased by and sold at his store, perhaps 5 percent were defective.

The party Chelsa attended on the evening of June 12 was held at the home of Mark Kairis, a sergeant with the California Highway Patrol. When defendant came to pick up Chelsa around 10:45 p.m., Kairis had a brief conversation with him. Kairis noticed nothing unusual about defendant's demeanor. Defendant did not appear nervous.

Photographs taken during the June 24 search of defendant's home showed some cobwebs and dead leaves on the ladder found near the garage. There was a bicycle alongside the ladder. It had dust on the seat, side bar, and cross bar. Because it was out in the country, Matteson did not know how long it would take dust to be deposited there. Defendant's home was next to an orchard; in the orchard were dirt and trees with leaves. The search took place roughly 12 days after the last time anyone heard from Deborah.

William Lehman, who was retired as of the time of trial but occasionally acted as an expert regarding police investigations, had spent approximately 31 years in law enforcement between the Fresno County Sheriff's Department and the district attorney's office, where he was an investigator. Taking both agencies into account, 18 of those years were spent in homicide. Lehman detailed what he viewed as deficiencies in the investigation of this case, primarily failure to (1) process the Morgan Stanley documents on Deborah's desk for fingerprints; (2) have the house examined for hair, fiber, and other trace evidence until July 14, by which time numerous people—including a cleaning crew—had been inside; (3) compare the contents of the vacuuming of defendant's vehicle with any trace evidence collected on July 14; (4) extensively analyze Deborah's computers; (5) physically examine defendant's person for bruises or other contusions when defendant was at the police station in the days shortly after Deborah's disappearance; and (6) interview the doctor Deborah visited, in the course of her employment, on June 12, and with whom she had a nonbusiness lunch scheduled a day or two after she disappeared.

Lehman was aware of no evidence to suggest a stun gun was used at Deborah's residence at the time in question. Given the amount of blood in the house and van, and the fact the blood spatter suggested some sort of blunt force with possibly more than one blow struck, Lehman would have expected to see blood transfers onto the perpetrator. However, the searches of defendant's Suburban did not turn up any trace or blood transfer evidence—something that might be expected if the Suburban was used in the homicide, unless there was a thorough cleaning.[41] Lehman was aware that at least six pairs of defendant's shoes were seized in the execution of various search warrants; yet, as far as Lehman knew, there was no blood or fiber evidence that might connect defendant to the scene of the crime. Lehman considered this exculpatory. This did not mean, however, defendant was not responsible for Deborah's murder; Lehman acknowledged that a killer does

---

[41] Lehman had no evidence the Suburban was used in the homicide. The fact no blood or fingerprints were found on the steering wheel, driver's area, pedals, or key of Deborah's van, or the garage door opener, meant it was possible the assailant took precautions not to leave or transfer evidence.

not leave evidence connecting him or her to the scene of the crime in every case.

In Lehman's opinion, defendant rightfully was the first person police looked at as a suspect in the case. When an investigator only has exculpatory evidence related to the main suspect, however, he or she should expand the focus of the investigation and try to get into the intimacies of the victim's life.

Lehman felt premeditation and planning "[a]bsolutely" were present in Deborah's murder. Given the condition of the house, this did not appear to be a burglary for purposes of theft. It appeared someone was looking at the Morgan Stanley account document; Lehman could think of no reason a common thief, drug addict, methamphetamine manufacturer, or someone from an Internet dating service would be interested in the records of the children's trust accounts. The blood placement indicated the bed was made after Deborah was assaulted, a very unusual circumstance. In addition, the taking of Deborah's body was unusual, because doing so created more risk for the culprit. That meant the perpetrator had to have a reason for taking the body. Absent the blood inside the house, the scene could have looked like Deborah left of her own accord. Given the neighborhood in which the van was parked, and the fact the key was in the ignition and the windows down, it was possible an attempt was made to have the van stolen. This could have sent police in the wrong direction. Had someone been found driving Deborah's van, a conclusion possibly could have been drawn that she was out on the town and fell victim to a carjacking or a similar chance encounter.

Since this appeared to have been a planned crime, Lehman agreed the assailant would have to have had a reason to kill Deborah. In his experience, the most common motivations for murder are money, power, and drugs. In this case, defendant had a monetary motive and hated the victim. Having reviewed the case, Lehman had found nobody who would profit from Deborah's death other than defendant. In Lehman's opinion, however, all the scenarios discussed at trial were merely possibilities. There was no real evidence.

Hawk, 2014 WL 4243705, at *1–18 (footnotes in original).

On March 21, 2016, Kings County Sheriff's deputies were dispatched to the area of 16th and Laurel Avenue regarding skeletal remains being found. The deputies were led approximately 1/2 mile south of the intersection and then east along a canal approximately 1/3 mile to the south end of a barley field. They were led approximately 115 feet north into the field where some bones were located. (ECF No. 58-55 at 187, 188.) The remains were in a grave approximately 3 to 3 1/2 feet deep. (Id. at 37.) The DNA profile of the remains was consistent with the DNA profile of Deborah. (Id.) "[N]o DNA typing results were obtained from the swabs of the apparent fingernail fragments" found at the location of the remains. (Id. at 191.)

**III.**

**STANDARD OF REVIEW**

21

1   Relief by way of a petition for writ of habeas corpus extends to a person in custody

2   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

3   or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

4   529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

5   by the United States Constitution. The challenged convictions arise out of the Kings County

6   Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a);

7   28 U.S.C. § 2241(d).

8   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

9   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

10  enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

11  Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

12  therefore governed by its provisions.

13  Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

14  unless a petitioner can show that the state court's adjudication of his claim:

15      (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
16      determined by the Supreme Court of the United States; or

17      (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
18      State court proceeding.

19  28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562

20  U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been

21  "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala,

22  576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is

23  reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

24  In ascertaining what is "clearly established Federal law," this Court must look to the

25  "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

26  relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

27  decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that

28  'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent

1    decisions"; otherwise, there is no clearly established Federal law for purposes of review under

2    AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742,

3    754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125,

4    123 (2008)).

5           If the Court determines there is clearly established Federal law governing the issue, the

6    Court then must consider whether the state court's decision was "contrary to, or involved an

7    unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A

8    state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at

9    a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

10   court decides a case differently than [the Supreme Court] has on a set of materially

11   indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an

12   unreasonable application of[] clearly established Federal law" if "there is no possibility

13   fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

14   Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

15   court's ruling on the claim being presented in federal court was so lacking in justification that

16   there was an error well understood and comprehended in existing law beyond any possibility for

17   fairminded disagreement." Id. at 103.

18          If the Court determines that the state court decision was "contrary to, or involved an

19   unreasonable application of, clearly established Federal law," and the error is not structural,

20   habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

21   injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

22   (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

23   (1946)).

24          AEDPA requires considerable deference to the state courts. Generally, federal courts

25   "look through" unexplained decisions and review "the last related state-court decision that does

26   provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

27   adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption

28   may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

1    different grounds than the lower state court's decision, such as alternative grounds for affirmance

2    that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

3    "When a federal claim has been presented to a state court[,] the state court has denied

4    relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

5    the state court adjudicated the claim on the merits in the absence of any indication or state-law

6    procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a

7    decision on the merits and there is no reasoned lower-court opinion, a federal court

8    independently reviews the record to determine whether habeas corpus relief is available under

9    § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

10   record is not *de novo* review of the constitutional issue, but rather, the only method by which we

11   can determine whether a silent state court decision is objectively unreasonable." Himes v.

12   Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

13   record and "must determine what arguments or theories . . . could have supported, the state

14   court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

15   those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

16   Court." Richter, 562 U.S. at 102.

17                                          **IV.**

18                                     **DISCUSSION**

19       **A.  Brady**

20       In his first and second claims for relief, Petitioner alleges that the prosecution failed to

21   provide exculpatory evidence prior to the preliminary hearing, in violation of Brady v. Maryland,

22   373 U.S. 83 (1963), and that the state court erred in determining that Petitioner had to show

23   prejudice stemming from the Brady error at his actual trial (rather than at the preliminary

24   hearing) in order to obtain relief. (ECF No. 1 at 4.) Respondent argues that the state court

25   reasonably denied Petitioner's Brady claim. (ECF No. 59 at 27.) This claim was raised on direct

26   appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a

27   reasoned decision. The claim was also raised in the petition for review, which the California

28   Supreme Court summarily denied. As federal courts "look through" summary denials and review

"the last related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192, this Court will examine the decision of the California Court of Appeal.

///

///

In denying Petitioner's <u>Brady</u> claim, the California Court of Appeal stated:

Defendant contends the prosecution violated its duty under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) prior to the preliminary hearing, thereby denying him due process.[42] We conclude defendant has failed to show the requisite prejudice.

**A. *Background***

The complaint in the murder case was filed May 30, 2008, and the preliminary hearing was held August 14 of that year. Prior to the preliminary hearing, defendant made an informal discovery request of the prosecutor, that included, as item 10, "Any evidence, information, documents and other materials favorable to the defendant in the possession of the District Attorney, or of any police department involved in the investigation of the case against defendant, or of any agency or person and available to the prosecution through the exercise of due diligence."

During the preliminary hearing, evidence was presented that, inter alia, a forensic evaluation of a computer seized from defendant's bedroom showed a May 17, 2006, Internet search for persons with the last name "Aguirre" in Fresno. One of the search "hits" was for L. Aguirre. The site provided an address.

Leonard Kim Aguirre was the attorney Deborah retained to modify child custody, obtain child support arrearages, and ensure certain accounts were maintained for the benefit of her children. Aguirre filed a motion for those items, as well as for attorney fees, verification the funds held by defendant at Morgan Stanley remained intact, and for reimbursement for medical expenses paid on behalf of the children. Aguirre also served a subpoena on Morgan Stanley for documents relating to the accounts. Defendant was served with the legal papers on December 28, 2005. Attorney Mary Steele subsequently filed, on behalf of defendant, a response, as well as a motion to quash the subpoena. A hearing on the matter (including the motion to quash) was set for March, and then continued to May 19, 2006. Aguirre was shot May 18, 2006, the day after the internet search for "Aguirre" in Fresno on the computer from the defendant's bedroom. Aguirre was, therefore, unable to appear on May 19. The hearing was continued again, but the matter was never heard due to Deborah's disappearance.

---

[42] Although defendant raises this claim in a supplemental brief, we address it first so our discussion of the issues conforms, to the extent possible, to the chronology of the proceedings below. (See *People v. Wash* (1993) 6 Cal.4th 215, 235, fn. 4.)

At oral argument, defendant challenged, for the first time, consolidation of the charges against him. This was improper (*People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 13; *People v. Dixon* (2007) 153 Cal.App.4th 985, 996), and we do not address this claim of error (see *People v. Lisenba* (1939) 14 Cal.2d 403, 435). To the extent defendant may have been attempting to include consolidation as part of his change of venue argument, an issue we discuss *post,* the record does not suggest consolidation had, or the absence thereof would have had, any effect on the factors relevant to the trial court's determination whether to move the trial to a different county, or our review of the trial court's ruling.

At the preliminary hearing, on cross-examination, Aguirre was asked if he had been interviewed by the police or investigators from the district attorney's office about the investigation into Deborah's disappearance. Aguirre stated he was contacted by investigators, but he did not know if they had come to see him about "this case or about [his] shooting." He said, "They seemed to be related." He explained, "[S]omeone comes to investigate one, they ask about the other."

At the conclusion of the preliminary hearing, defendant was held to answer on the murder charge.

On February 13, 2009, defendant filed a nonstatutory motion to dismiss for violation of his right to due process. He asserted the prosecution failed to provide two Fresno Police Department reports concerning the May 18, 2006, shooting of Aguirre, and that such a failure violated *Brady.* He subsequently filed an addendum to which he appended the pertinent police reports and other exhibits.

According to the motion, addendum, and supporting declaration of defense counsel, on September 30, 2008, counsel met with representatives of the Kings County District Attorney's Office. He was informed they had no information from the Fresno Police Department regarding the Aguirre shooting. The motion asserted that none of the discovery provided to the defense as of that point indicated anyone other than defendant was the key suspect in the Aguirre shooting. Additionally, three days before Aguirre was shot, his office building had been shot at. The defense asserted it also had no knowledge of the office building incident. It was pointed out that the prior shooting was two days before the search for the name "Aguirre" was conducted on defendant's computer.

According to the motion, defense counsel, on December 9, 2008, served a subpoena duces tecum on the Fresno Police Department, seeking all reports relating to the May 18, 2006, shooting of Aguirre. The reports received stated the suspect in that shooting was Jim Farnham. Aguirre suffered what appeared to be a small caliber gunshot wound to the neck. When Fresno Police Officer Stewart arrived on the scene of the Aguirre shooting, Stewart asked Aguirre if he knew who did this. Aguirre immediately named Jim Farnham. Aguirre subsequently told Fresno Police Detective Renfro that a hearing was scheduled for May 18, 2006, in which he represented Farnham's mother, who had been awarded custody of Farnham's children. Aguirre said Farnham was the only person he could think of who could have been responsible. Farnham was subsequently detained and gunshot residue tests were performed, but apparently not submitted for analysis. When interviewed by another detective, Farnham's mother said she was sure Farnham was involved. It was further reported Farnham had made threats of physical violence against Aguirre. In a subsequent interview, Aguirre told Renfro about the May 15, 2006, shooting at his office building. He stated the majority of the rounds were directed at his office. Renfro's report further stated that he was contacted by Agent Beza of DOJ on July 6, 2006. Beza told Renfro he was assisting the Hanford Police Department with Deborah's disappearance, and requested a copy of the crime reports relating to the investigation of the two shootings—the shooting of Aguirre, and the shooting at Aguirre's office building. The requested reports were transmitted to Beza. On July 20, 2006, Renfro received a telephone call from an investigator with the Kings County District Attorney's Office, who said he was assisting Detective Matteson of the Hanford Police Department concerning Deborah's disappearance. That same day, Renfro and the Kings County District Attorney's Office investigator went to Aguirre's office, where Aguirre pointed out a bullet hole in the window casing. A bullet slug was recovered from the exterior wall of Aguirre's office. Renfro directed the

26

Fresno Police Department identification technician to send the recovered slug to DOJ for further analysis when the Bureau of Forensic Services case number relating to Deborah's disappearance was determined. On August 9, 2006, Renfro attended a meeting with several investigators from the Kings County District Attorney's Office. In that meeting, it was determined the recovered slug should be sent to DOJ as soon as possible. On or about November 1, 2007, Renfro received information from a DOJ criminalist that the recovered bullet from the shooting of Aguirre's office building matched one of the two firearms seized during the investigation of Farnham.

In his motion to dismiss, defendant contended the prosecutor's failure to provide the two Fresno Police Department reports violated *Brady,* and the case against defendant should be dismissed.[43] The People opposed the motion, arguing there was no *Brady* violation. An evidentiary hearing was held on March 27, 2009.[44] The court subsequently denied the motion without explanation. On June 25, 2009, defendant petitioned this court for a writ of mandate, challenging denial of the motion to dismiss. By order filed June 30, 2009, we summarily denied the petition.

At trial, defendant sought, via motion in limine, to preclude the admission of evidence relating to the Aguirre shooting. By the time of trial, Farnham had been convicted in Fresno Superior Court for the shooting at Aguirre's office building. According to the prosecution, Farnham had been "cleared" of the shooting of Aguirre by the Fresno Police Department. The prosecution argued, although it was initially thought Farnham shot Aguirre, the evidence now tended to prove defendant committed the Aguirre shooting which, in turn, "give[s] rise to inferences that point to [defendant's] guilt" in Deborah's murder. The trial court granted defendant's motion in limine. The evidence was not admitted at trial.

**B. *Analysis***

" 'The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant' when the evidence is 'both favorable to the defendant and material on either guilt or punishment.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 866; see *Brady, supra,* 373 U.S. at p. 87.) "The duty of disclosure exits regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The

---

[43] Defendant further contended the lack of disclosure interfered with defense counsel's ability to prepare and present a defense for, and cross-examine witnesses at, the preliminary hearing, and with the magistrate's ability to determine whether an adequate showing of probable cause existed. As defendant does not separately raise these grounds on appeal, we address them—as does he—only to the extent they relate to his *Brady* claim.

[44] Testimony adduced at the hearing essentially supported and elaborated on the information contained in the motion, supporting declaration, and addendum. In addition, Renfro related that, at some point during the investigation of the Aguirre shooting, Deborah telephoned the Fresno Police Department to implicate defendant as the shooter. Renfro subsequently learned Deborah disappeared shortly after making that call. After her disappearance, Renfro personally was contacted by Aguirre, who related that Deborah had also contacted him and said she thought defendant was responsible for the shooting. The receipt of this information caused Renfro to contact the Hanford Police Department, as it seemed like a logical area for them to investigate.

Renfro also testified Aguirre was shot with a different gun than was used in the shooting of his office building. By the time of the hearing on the motion, Renfro believed the office shooting had been solved. The shooting of Aguirre was still unsolved, however. Because time frames, witness statements, and ballistics did not match up, the person believed to have shot at the building—Farnham—likely did not shoot Aguirre. This conclusion was based on witness accounts of Farnham's whereabouts, cellular tower locations where he was making calls, and the time of his arrival at Fresno Superior Court, where he was detained.

27

obligation is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Kyles v. Whitley* (1995) 514 U.S. 419, 437.) "Because 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police' [citation], '*Brady* suppression occurs when the government fails to turn over even evidence that is "known only to police investigators and not to the prosecutor"' [citations]." (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225; see *Youngblood v. West Virginia* (2006) 547 U.S. 867, 870.)

For *Brady* purposes, "[e]vidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.] [¶] Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result ... would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[ ] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*In re Sassounian* (1995) 9 Cal.4th 535, 544; see *Kyles v. Whitley, supra,* 514 U.S. at p. 434.)

To obtain relief, a defendant "must show both the favorableness and the materiality of any evidence not disclosed by the prosecution." (*In re Sassounian, supra,* 9 Cal.4th at p. 545.) Such a showing "establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.]" (*Id.* at p. 545, fn. 7.) In other words, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different [result]." (*Strickler v. Greene* (1999) 527 U.S. 263, 281.)

At least two appellate courts have concluded that, despite the changes to the nature and purpose of preliminary hearings due to the adoption, on June 5, 1990, of the initiative measure known as Proposition 115, the "Crime Victims Justice Reform Act" (see *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 363; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 343–344), the prosecution's obligation under *Brady* exists at the preliminary hearing stage (*Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074, 1083– 1087; *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 351–356). For purposes of our analysis, we will assume they are correct, and will adopt *Bridgeforth*'s definition of *Brady* materiality as "necessarily tailored to the context and purpose of the preliminary hearing. [Citations.] ... [T]he standard of materiality is whether there is a reasonable probability that disclosure of the exculpatory or impeaching evidence would have altered the magistrate's probable cause determination with respect to any charge or allegation. [Citation.]" (*Bridgeforth, supra,* at p. 1087.)

"[D]enial of a substantial right at the preliminary examination renders the ensuing commitment illegal...." (*People v. Pompa–Ortiz* (1980) 27 Cal.3d 519, 523 (*Pompa–Ortiz* ).) "Deprivation of a substantial right is properly addressed by a section 995 motion when the error is visible from the 'four corners' of the preliminary hearing transcript. By contrast, an error that is not known or visible at the hearing itself ..., may be called to the court's attention through a nonstatutory

motion to dismiss. [Citations.] The trial court considers the materiality of the nondisclosed information and determines its effect on probable cause and the legality of the commitment proceedings. [Citation.]" (*People v. Duncan* (2000) 78 Cal.App.4th 765, 772, fn. omitted; see *Currie v. Superior Court* (1991) 230 Cal.App.3d 83, 90–91.)

Defendant here moved for dismissal of the murder charge based on the alleged *Brady* violation. He properly used a nonstatutory motion as his means of doing so, and was rightly granted the opportunity to make an evidentiary showing that he was deprived of a substantial right at the preliminary hearing. (See *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265, 270–271.) As previously described, when his motion was denied, he challenged the ruling in this court. His writ petition was denied.

Defendant now argues disclosure of the information relating to the Aguirre shooting would have created a reasonable probability of a different outcome at the preliminary hearing, to wit, he would not have been held to answer. This being the case, the argument runs, the undisclosed information was "material" for *Brady* purposes, and he is entitled to reversal of his murder conviction and remand for a new preliminary hearing. Defendant fails to differentiate between the showing he was required to make to obtain relief before trial, and the showing he is required to make to obtain relief on appeal after trial.

A *Brady* violation at the preliminary hearing constitutes the deprivation of a substantial right. (*People v. Gutierrez, supra,* 214 Cal.App.4th at p. 356; see *Jennings v. Superior Court* (1967) 66 Cal.2d 867, 874–875; *Stanton v. Superior Court, supra,* 193 Cal.App.3d at p. 272.) When the alleged error is raised by means of a nonstatutory motion to dismiss, dismissal of the information is not compelled. (*Stanton v. Superior Court, supra,* 193 Cal.App.3d at p. 272.) "[I]rregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair *trial* or otherwise suffered prejudice as a result of the error at the preliminary examination." (*Pompa–Ortiz, supra,* 27 Cal.3d at p. 529, italics added.)[45] Constitutional error at the preliminary examination is similarly reviewed. "Moreover, our resolution is consistent with the United States Supreme Court's treatment of constitutional error at the preliminary examination. Thus, even in a situation as extreme as the denial of counsel, the U.S. Supreme Court has held that the harmless error rule is applicable. (See *Coleman v. Alabama* (1970) 399 U.S. 1, 11.)" (*Id.* at p. 530.) "[A] conviction [generally] will not be reversed because of errors or irregularities that occurred at a preliminary hearing ..., absent a showing that the asserted errors 'deprived [the defendant] of a fair *trial* or otherwise resulted in any *actual prejudice relating to [the] conviction.*' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 178, italics

---

[45] " '[A] lack of jurisdiction in its fundamental or strict sense results in " 'an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.] On the other hand, a court may have jurisdiction in the strict sense but nevertheless lack ' "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' [Citation.] When a court fails to conduct itself in the manner prescribed, it is said to have acted in *excess* of jurisdiction." [Citations.]' [Citation.] ' "[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent ..." [whereas] "an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time." ' [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 139–140.) A *Brady* violation at the preliminary hearing is not jurisdictional in the fundamental sense, as the state Supreme Court has defined that term.

added.) Accordingly, defendant is not entitled to reversal on appeal absent a showing he was prejudiced *at trial.* (*Pompa–Ortiz, supra,* at p. 522.) This is so even where, as here, he filed a pretrial writ petition. (See *People v. Booker* (2011) 51 Cal.4th 141, 157 & fn. 7.)

Defendant does not attempt to show he was prejudiced at trial.[46] In our view, such a showing cannot be made: At defendant's request, no evidence concerning the incident was admitted at trial. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 951; cf. *People v. Letner and Tobin, supra,* 50 Cal.4th at p. 140; *People v. Millwee* (1998) 18 Cal.4th 96, 121–122.) Accordingly, defendant is not entitled to reversal of his conviction and a new preliminary hearing. (*Pompa–Ortiz, supra,* 27 Cal.3d at p. 530.)

<u>Hawk</u>, 2014 WL 4243705, at *18–23 (footnotes in original).

In <u>Brady</u>, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976). The duty to disclose under <u>Brady</u> also extends to evidence that the defense might use to impeach prosecution witnesses. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> at 682. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> To establish that a <u>Brady</u> violation undermines a conviction, Petitioner must show: "(1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" <u>Skinner v. Switzer</u>, 562 U.S. 521, 536 (2011) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999)).

Here, Petitioner alleges that the prosecution failed to provide exculpatory evidence prior

---

[46] Neither party mentioned *Pompa–Ortiz.* Although that case concerned an unlawful commitment raised by means of a section 995 motion, we have found no authority suggesting its requirement that prejudice be shown posttrial is inapplicable in situations involving a nonstatutory motion to dismiss.

We note that had defendant's motion to dismiss been granted, there would have been no impediment to the prosecution refiling the murder charge and proceeding anew, since jeopardy would not yet have attached (see *Yeager v. United States* (2009) 557 U.S. 110, 129; *People v. Riggs* (2008) 44 Cal.4th 248, 278, fn. 12) and there had been no previous dismissals (see § 1387).

1  to the preliminary hearing, in violation of <u>Brady</u>, and that the state court erred in determining that

2  Petitioner had to show prejudice stemming from the <u>Brady</u> error at his actual trial (rather than at

3  the preliminary hearing) in order to obtain relief. (ECF No. 1 at 4.) Petitioner has not provided,

4  and the Court is not aware of, any Supreme Court authority holding that a petitioner's due

5  process rights are violated by a prosecutor's failure to disclose <u>Brady</u> material prior to the

6  preliminary hearing. The Ninth Circuit has held that "existing Supreme Court case law does not

7  clearly establish that the prosecution was required to disclose the impeachment information

8  about [a prosecution witness] before, rather than after, [the petitioner]'s preliminary hearing,"

9  and "[t]hus, the California courts' decision to uphold [the petitioner]'s convictions over his

10  *Brady* objection did not result from an 'unreasonable application' of clearly established Supreme

11  Court precedent[.]" <u>Jaffe v. Brown</u>, 473 F. App'x 557, 559 (9th Cir. 2012). Moreover,

12  "[e]vidence is deemed prejudicial, or material, only if it undermines confidence in the outcome

13  of the *trial*." <u>Benn v. Lambert</u>, 283 F.3d 1040, 1053 (9th Cir. 2002) (emphasis added) (citing

14  <u>Bagley</u>, 473 U.S. at 676; <u>Agurs</u>, 427 U.S. at 111–12).

15        Therefore, the Court finds that the state court's rejection of Petitioner's <u>Brady</u> claim was

16  not contrary to, or an unreasonable application of, clearly established federal law. The state

17  court's decision was not "so lacking in justification that there was an error well understood and

18  comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562

19  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his <u>Brady</u> claim, and it

20  should be denied.

21        **B.  Venue**

22        In his third claim for relief, Petitioner asserts that the trial court erred in denying the

23  change of venue motion. (ECF No. 1 at 5.) Respondent argues that the state court reasonably

24  rejected a change of venue claim. (ECF No. 59 at 33.) This claim was raised on direct appeal in

25  the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

26  decision. The claim was also raised in the petition for review, which the California Supreme

27  Court summarily denied. As federal courts "look through" summary denials and review "the last

28  related state-court decision that does provide a relevant rationale," <u>Wilson</u>, 138 S. Ct. at 1192,

this Court will examine the decision of the California Court of Appeal.

///

///

In denying Petitioner's change of venue claim, the California Court of Appeal stated:

### CHANGE OF VENUE

Defendant unsuccessfully sought to change trial venue out of Kings County. He contends the trial court erred by denying (1) his request for funds to have a survey conducted to determine community attitudes and whether defendant could get a fair trial in Kings County, and (2) his motion for a change of venue.

**A. Background and Procedural History**

There was pretrial media coverage at both the local and the national level of Deborah's disappearance and the ensuing criminal proceedings against defendant.

In April 2009, defense counsel submitted an application for funding to conduct a community survey regarding pretrial publicity. It appears from the transcript of the May 22, 2009, in camera hearing on the request for funding, that defendant sought appointment of a jury consultant.[47] At that hearing, defense counsel represented that more than 900 news articles about the case had been published, the expert with whom the defense had consulted believed there was a substantial likelihood the jury pool had been tainted and a survey needed to be conducted, and defendant was indigent. The court stated: "I read your moving papers, I am not inclined to spend the $20,000 for the jury poll survey because I think the [sic] we could call in a panel and we could just ask and if [defendant] cannot get a fair trial here in Kings County, we will move it and I think the surest way to find out is call people in and ask them."

On July 9, 2009, defendant moved for a change of venue on the ground pretrial publicity would prevent him from receiving a fair trial before an impartial jury in Kings County. In support thereof, defendant submitted, inter alia, copies of newspapers articles and transcripts of media broadcasts concerning this case. He also lodged a declaration of Craig New (who held a doctorate in Interdisciplinary Social Psychology, worked independently as a litigation consultant, and had long been involved in the assessment of support for change of venue motions), together with various exhibits.

New related that he had reviewed media from several sources, but focused, in his declaration, on the reports found in the Hanford Sentinel. A search of that newspaper's Web site returned 140 articles related to the case, with the latest appearing June 26, 2009.[48] His search showed a "barrage of coverage when the story broke," which reached a weekly peak of 10 articles in the second week. Since that time, the case was a "consistent presence in the media for three years," with an average of one to two stories appearing each week from about the 10th week on. New considered the publicity "extensive," particularly in such a small

---

[47] The application/motion is not contained in the record on appeal and appellate counsel (who was also one of defendant's trial attorneys) has not requested augmentation of the record in that regard.

[48] New signed his declaration on July 10, 2009.

venue, and noted the Hanford Sentinel had named the case as "a top story each year since 2006."

New considered the nature of the publicity to have been "inflammatory and prejudicial," with reports quickly focusing on defendant regarding Deborah's disappearance and, later, the shooting of her attorney. New further noted that, almost a year after Deborah's disappearance, defendant was arrested on charges of embezzlement from his children's trust accounts and of possession of child pornography on his computer. Although it was New's belief the latter charge had been dismissed and would not come up at trial, it was referred to on numerous occasions in the media, was highly inflammatory, and was "likely" well known by the public.

New further related that Deborah had been portrayed by the media as being well liked and respected. In contrast, defendant had been portrayed in "a largely negative light." New noted the Hanford Sentinel twice ran articles describing interviews with area residents regarding the case, and a "strong majority" of those interviewed expressed a belief in defendant's guilt.

Based on his review of the publicity, New opined it would be "exceedingly difficult to seat a fair and impartial jury in this case." He expected a "significant percentage" of potential jurors to have knowledge about the case, and he noted such knowledge had been acquired without the benefit of cross-examination and the protections afforded by the rules of evidence; hence, it might include inadmissible and/or inaccurate information. New stated that research in the field of psychology and law had "convincingly demonstrated" that exposure to pretrial publicity leads individuals to believe the defendant is guilty prior to trial; further, the more knowledge an individual has about a case from exposure to pretrial publicity, the more likely that person is to believe in the defendant's guilt. In addition, an individual's existing information about a case, and attitude concerning the defendant and his or her culpability, influences how the individual processes new information received at trial. Individuals generally have a "cognitive preference" for information confirming his or her previously held beliefs.

In conclusion, New declared: "Due to the repetitious recitation of facts in the media, many jurors are likely to enter the courthouse already aware that [defendant] is on trial for the murder of his ex-wife, that the Hawks were involved in an acrimonious divorce proceeding, that [Deborah's] divorce attorney was shot days before a contentious custody hearing, and that [defendant] was charged with embezzling money from his children's trust funds and with possession of child pornography. This is a substantial hurdle for the defense to overcome."

The People opposed the change of venue motion. They argued defendant had failed to show a reasonable likelihood he could not receive a fair trial in Kings County, and analogized New's declaration to a public opinion survey and stated it was "simply his speculative opinion." The People argued the preference was for actual voir dire rather than "expert 'predictions,' " and requested the motion be denied pending actual voir dire of prospective jurors.

On July 20, 2009, defendant stated he would provide the court and opposing counsel with an additional CD, make a further brief argument, and then submit the matter. The parties agreed to have a bifurcated juror questionnaire, so that questions dealing with pretrial publicity and the change of venue motion would be contained in a questionnaire separate from the standard questionnaire. In an in

camera hearing that same day, defense counsel renewed his request for a jury consultant and asked for funding to have New conduct a change of venue survey. Alternatively, counsel requested a maximum of $4,400 for New to come to Hanford and be present during the initial portion of jury selection. The trial court granted this latter request.

The change of venue motion was argued the next day. At the conclusion, the court stated:

> "The motion is well taken. But my analysis of the situation, I want to see the jurors. I want to ask the jurors questions and I want to satisfy my own mind that either [defendant] or the People could not get a fair trial. If ... I come to that conclusion, the case is moved.

> "So it's not one of those situations that I'm pre-judging it. I'm going to wait and see and where the answers fall is where the Court is going to make its decision. So we're going to do that Monday."

Jury selection began the following Monday, July 27, 2009. In pertinent part, the court told prospective jurors that those requesting to be excused for hardship would be asked to fill out a one-page form stating the nature thereof; those not excused for or claiming hardship would be asked to complete a five- or six-page form concerning pretrial publicity; they would then individually interview each prospective juror outside the presence of the other prospective jurors, and would determine whether the publicity had affected anyone's ability to be fair and impartial; and those who remained after that step would then fill out a lengthier questionnaire in preparation for jury selection in open court.

Jury selection concluded August 7, 2009. In all, four panels of prospective jurors (approximately 360 people) were called. At the conclusion of voir dire, 75 prospective jurors remained.

On August 6, 2009, before the parties began exercising peremptory challenges, the change of venue motion was heard. New, who had been studying juror behavior for about 10 years, testified as an expert in jury selection research and media.

Upon being retained by the defense in the present case, New reviewed the media coverage. Due to its extent, duration, and content, he recommended a community attitude survey.[49] Because one was not done, he utilized an option he had used in other cases: an extensive juror questionnaire.[50]

---

[49] According to New, such a survey would, at least in part, measure recognition. It would give people some information and ask if they recognized it. This could not be done during jury selection, because it would be undesirable to tell people things they did not already know.

[50] The record on appeal was belatedly augmented to include the reporter's transcript of the change of venue hearing. In his opening brief, defendant does not summarize New's testimony at that hearing, but merely asserts New opined that, based on pretrial publicity, defendant could not receive a fair trial in Kings County.

In addition, although the clerk's transcript contains the prospective jurors' hardship declarations and general questionnaires, it does not contain the questionnaires regarding pretrial publicity. It is appellate counsel's duty to ensure there is an adequate record before this court. (*People v. Barton* (1978) 21 Cal.3d 513, 519–520.) Only at oral argument, after we observed the publicity questionnaires were not before us, was a request made to augment the record to include them. Although it appears we have the power to grant such a request (see rules 8.155, 8.340(c)), we also have the authority to deny it (see *People v. Bronson* (1968) 263 Cal.App.2d 831, 847). Under the circumstances, we conclude it came too late. The request is denied.

Based on his research, everything he reviewed (all the articles about the case that appeared in the Hanford Sentinel; publicity from other newspapers, some Internet sites, and some of the televised media; and all the juror questionnaires), and his observation of about two and a half days of individual voir dire, New opined venue should be changed. He gave two reasons for his opinion.

First, given the number of individuals examined and limitations inherent in the voir dire process, New thought it reasonably likely some individuals remained among the final 75 prospective jurors who might not be able to be fair and impartial. New explained that high profile cases such as this one "really test the limits of the voir dire capacity to get a fair and impartial panel." This is so because of the social desirability implications of the situation. People want to portray themselves in a positive light, or at least avoid a negative evaluation. When citizens come in for jury selection, they know or quickly learn jurors need to be fair and impartial. There is pressure to conform to those standards.[51] In addition, some people will be intimidated by the situation. New felt it likely some prospective jurors—intentionally or unintentionally—withheld some information, minimized what they knew about the case or the strength of their opinions, or failed to recognize the extent of their own bias.

New calculated that, of the 75 prospective jurors who remained, 88 percent were aware of the case, 51 percent had discussed the case with other people, and 28 percent had an initial opinion defendant was guilty or probably guilty. New recognized the prospective jurors had given assurances they could set aside what they knew and decide the case on the evidence presented in court. He believed some of those assurances were accurate. Others, however, were not, because research has shown people have a hard time judging their own abilities to set things aside. The more someone knows about a case, the more difficult it will be to set that knowledge aside. Moreover, discussion of the case with other people creates a particular problem, because people tend to ascribe more credibility to friends and family as sources than they do to media. In exchanging information, speculating about defendant's guilt, and talking about reasons for their opinions, people essentially engage in the task jurors perform at the end of trial, but they do so before trial with incomplete and questionable information. This process can create real bias that may unintentionally be carried into deliberations. In addition, community pressure becomes a concern.

New explained that the fact prospective jurors had already discussed the case or formed their own opinions could affect their ability to process new information received through trial. Research has shown people have a preference for information that is consistent with their preexisting attitudes or knowledge. This means jurors listening to evidence will be more likely to remember things they have already heard and things that are consistent with their current attitudes, while being more likely to forget things that are contrary to their previously held beliefs. There is also "predecisional distortion," which, research shows, means jurors will distort the strength of new information in the direction of whatever opinion they hold at the time. This is particularly important in its effect on interpretation of ambiguous evidence.

---

[51] In New's experience, the percentage of people who admit to having prejudged a case tends to be higher when a survey is done than it is when people come to court. Research suggests this is, according to New, because when someone comes to court, there are social desirability implications and the person has been instructed in the law by the judge. New believed people were more forthright in a survey situation.

New further explained that "[o]ne of the most robust relationships" in research concerning pretrial publicity is the relationship between case knowledge and prejudgment. Specifically, the more someone knows about a case, the more likely he or she is to believe the defendant is guilty, because information carried in the press usually has a pro-prosecution slant. Also, the more knowledge someone has, the greater the problem with source disassociation, i.e., the idea that the source of the information gets disassociated in memory from the actual information. When a juror who already knew several things about the case and then received a lot of information during a lengthy trial must pull all the information together and make a decision, it will be difficult for that person to separate what he or she heard in the media from what he or she heard at trial. This in turn will make it difficult for the juror to judge the credibility of the information.

The second reason New opined venue should be changed was his concern, given the large number of persons who have to be eliminated and excused in high profile cases such as this one, that those left will not be a good representation of the community. He explained that some research has shown those most likely to be dismissed in high profile cases because they know too much and have opinions are also the people with the highest "civic capital," meaning the people most likely to be involved in the community. The people who are left tend to be those who have lower education, do not follow the local news, are not interested or do not participate much in local events, and people who are new to the area. In New's opinion, these people are not a fair cross-section of the community.[52]

In conclusion, New opined there was a reasonable likelihood defendant would not receive a fair trial absent a change of venue.

After argument, the court stated: "I spent eight days going through the voir dire process. And I have a lot of confidence in the voir dire process. I was able to review the jurors. I was able to watch their body language. I was able to watch the way they responded to the questions. And I'm satisfied in my mind that Mr. Hawk can get a fair trial in Kings County...." Accordingly, it denied the motion.

Thereafter, defendant exercised nine peremptory challenges with respect to the trial jurors and three with respect to the eight alternates. Defense counsel subsequently stated for the record: "[I]n exercising peremptory challenges here we basically have gone through all of the potential jurors and although that we didn't exhaust all 20 peremptory challenges. We did that for tactical reasons. We graded jurors and there were a group of jurors who were about to be called into the box who we believe would be unable to give the defendant a fair trial. Therefore, for tactical reasons we were satisfied with the group that was seated and waived use of any of our other peremptory challenges, but we do believe in light of the Court's ruling to the venue motion yesterday that it had to be done in that fashion."

**B.** *Analysis*

    1. *Denial of Survey Funds*

In his opening brief, defendant says judgment should be reversed because the trial court erred by denying his request for survey funds. The sole authority cited in support of this assertion is *People v. Daniels* (1991) 52 Cal.3d 815, 851 (*Daniels*),

---

[52] New felt this opinion was supported by the fact "not many" of the 75 remaining prospective jurors read the Hanford Sentinel more than once a week.

wherein the California Supreme Court stated: "The motion for funds to undertake a community survey is one addressed to the discretion of the trial court. [Citation.] The court, however, must exercise its discretion on the basis of such considerations as the cost and feasibility of the survey, and whether the results of such a survey would be of significant value in deciding a pretrial motion to change venue. It cannot refuse to exercise discretion on the theory that voir dire of the jury is a better method of assessing the need to change venue, as that reasoning would deny a defendant his right *under section 987.9* to funds reasonably necessary to present his pretrial venue motion." (Italics added.)

First, and contrary to defendant's apparent belief, the erroneous denial of survey funds does not require reversal absent a showing of prejudice. (See *Daniels, supra,* 52 Cal.3d at p. 851 [finding defendant was not prejudiced by trial court's erroneous ruling].)

Second, as the Attorney General points out and defendant subsequently acknowledges, *Daniels*'s statement was made in the context of a defendant's right to ancillary funds under section 987.9. (*Daniels, supra,* 52 Cal.3d at p. 851.) That statute applies, by its express terms, only to capital cases or cases tried under section 190.05, subdivision (a). (§ 987.9, subd. (a).)[53] *Daniels* was a capital case. (*Daniels, supra,* at p. 837.) By the time defendant requested survey funds, his case was not: On September 29, 2008, the People gave notice they would not be seeking the death penalty. Accordingly, section 987.9 was not applicable. (*Sand v. Superior Court* (1983) 34 Cal.3d 567, 572; see *Gardner v. Superior Court* (2010) 185 Cal.App.4th 1003, 1014.)

In his reply brief, defendant attempts to salvage the situation by claiming, for the first time, that the trial court's denial of the requested funds violated his Sixth Amendment right to the effective assistance of counsel at trial. It is normally improper to raise new contentions for the first time in a reply brief, and claims so raised may be deemed forfeited. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 & cases cited; *People v. Zamudio* (2008) 43 Cal.4th 327, 353–354; *People v. Taylor* (2004) 119 Cal.App.4th 628, 642–643.) Even if we address the issue on the merits, however, defendant does not prevail.

"It cannot be doubted that the right to counsel guaranteed by both the federal and state Constitutions includes, and indeed presumes, the right to effective counsel [citations], and thus also includes the right to reasonably necessary ancillary defense services. [Citations.]" (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319–320, fns. omitted.) This is so even in cases to which section 987.9 does not apply. (See *Sand v. Superior Court, supra,* 34 Cal.3d at p. 575.) However, the defendant has the burden of demonstrating the need for the requested services "by reference to ' "the general lines of inquiry he wishes to pursue, being as specific as possible." ' [Citations.]" (*Corenevsky v. Superior Court, supra,* at p. 320, fn. omitted; accord, *People v. Guerra* (2006) 37 Cal.4th 1067, 1085, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary. [Citation.] On appeal, a trial court's order on a motion for ancillary services is

---

[53] Section 987.9, subdivision (a) provides, in pertinent part: "In the trial of a capital case or a case under subdivision (a) of Section 190.05, the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense."

Section 190.05, subdivision (a) specifies the penalty for a defendant found guilty of second degree murder after having served a prior prison term for first or second degree murder.

reviewed for abuse of discretion. [Citations.]" (*People v. Guerra, supra,* at p. 1085.)

As previously described, defendant's application for survey funds and any supporting declarations are not contained in the record on appeal, and appellate counsel has not sought augmentation with respect to those items. Again, it is appellate counsel's duty to ensure there is an adequate record before this court. (*People v. Barton, supra,* 21 Cal.3d at pp. 519–520.) "[A]buse of discretion is not to be presumed; ' "[a] judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' [Citations.]" (*Lucero v. Superior Court* (1981) 122 Cal.App.3d 484, 489.) On the record before us, "a determination that the trial court abused its discretion would necessarily be based upon rank speculation." (*Ibid.;* contra, *Tran v. Superior Court* (2001) 92 Cal.App.4th 1149, 1152 [in application for ancillary funds, defense counsel extensively detailed nature of offense, counsel's experience as defense attorney, defendant's indigence, nature of ancillary services requested and why they were necessary, and why amount requested was reasonable].) "[A] survey is not required in order to make or support a motion to change venue" (*People v. Beames* (2007) 40 Cal.4th 907, 920), and defendant has failed to demonstrate (and likely could not demonstrate, even on a complete record) that the trial court erred in concluding actual voir dire would be more beneficial than a survey to its determination whether defendant could obtain a fair trial in Kings County (see *id.* at pp. 921–922 & fn 8; cf. *People v. Edelbacher* (1989) 47 Cal.3d 983, 1002–1003 [any inference from survey responses that impartial jury could not be impaneled refuted by actualities of voir dire], disapproved on another ground in *People v. Loyd* (2002) 27 Cal.4th 997, 1007, fn. 12.)

### 2. *Denial of Change of Venue Motion*

" ' "A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.' " (*People v. Panah* (2005) 35 Cal.4th 395, 447; § 1033, subd. (a).) " '[R]easonable likelihood' " means something less than " 'more probable than not,' " but something more than "merely 'possible.' " (*People v. Bonin* (1988) 46 Cal.3d 659, 673, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Each case is resolved on its own facts, and the moving party bears the burden of proof. (*People v. Sanders* (1995) 11 Cal.4th 475, 505.)

"In contrast to pretrial appellate review by way of a petition for a writ of mandate, review on appeal is retrospective. Thus, 'any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 360.) "On appeal," "the defendant must show both that the [trial] court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not *in fact* had." ' [Citation.]" (*People v. Jenkins, supra,* 22 Cal.4th at p. 943.)[54]

---

[54] Defendant asserts the procedure followed by the trial court in the present case effectively deprived him of the opportunity to seek pretrial relief from denial of the change of venue motion. He "submits that where the court, on its own motion, continues a change of venue motion, as in the case at bar, that results in the defendant having

On appeal, we review the trial court's resolution of factual questions for substantial evidence, but we independently determine the ultimate question of whether a fair trial was obtainable. (*People v. Sanders, supra,* 11 Cal.4th at pp. 505–506; *People v. Jennings, supra,* 53 Cal.3d at pp. 359–360.) This de novo standard of review applies to our consideration of the five factors we must examine in making that determination: (1) the nature and gravity of the offenses; (2) the nature and extent of the media coverage; (3) the size of the community; (4) the status of the defendant in the community; and (5) the popularity and prominence of the victim. (*People v. Panah, supra,* 35 Cal.4th at p. 447; *People v. Jennings, supra,* 53 Cal.3d at p. 360; *People v. Harris* (1981) 28 Cal.3d 935, 948.)

With regard to the first factor, "[t]he peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (*Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582.) Special-circumstance murder is an offense of "utmost gravity," even when the death penalty is not sought. (*Williams v. Superior Court* (1983) 34 Cal.3d 584, 593.) The murder for financial gain involved here is an extremely serious offense; thus, this factor favors, but does not compel, a change of venue. (*People v. Davis* (2009) 46 Cal.4th 539, 578; *People v. Weaver* (2001) 26 Cal.4th 876, 905.) Although the fact no body was ever found, and allegations defendant embezzled funds from his own children's trust accounts impact the nature of the case, these are matters that "will not change with a change of venue." (*People v. Edwards* (1991) 54 Cal.3d 787, 808.) " 'Prospective jurors would sympathize with [Deborah's] fate' [and the children's situation] no matter where the trial was held, and this sympathy stems from the nature of the crime, 'not the locale of trial.' [Citation.]" (*People v. Davis, supra,* 46 Cal.4th at p. 578.)

Not surprisingly, the nature of the case led to extensive and occasionally sensationalized media coverage, and resultant recognition within Kings County. We conclude, however, that this second factor, which weighed in favor of a change of venue, did not require that the trial be moved.

"Pervasive publicity alone does not establish prejudice. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1214.) " ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." ' [Citations.]" (*People v. Panah, supra,* 35 Cal.4th at p. 448.) "The relevant question is not whether the community remembered the case, but whether the jurors at [defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant. [Citation.] It is not unusual that one

---

effectively lost his right to seek relief by way of a writ, then the same standard of review that applies in mandamus should apply in any direct appeal." Defendant does not cite any authority for his proposition. Moreover, he did not object to the procedure employed by the trial court. The motion initially was heard on July 21, 2009, almost a week before jury selection began; had defendant been concerned about inability to seek pretrial review, he could have asked the court to issue a formal ruling denying the motion without prejudice (which was the substance of what the court did in any event), then sought a stay of trial in order to permit him to seek such review.

Under the circumstances, we decline to review the issue as if it was before us in a pretrial writ petition. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1250 [applying posttrial review standard where motion denied after voir dire and one day before trial began].) A trial court may properly attempt to impanel a jury before making a final ruling on a motion for a change of venue. (See *People v. Bolin* (1998) 18 Cal.4th 297, 312; rule 4.151(b).) The trial court was not required to credit testimony that voir dire, the traditional method of obtaining a fair and impartial jury, could not be efficacious in weeding out bias resulting from pretrial publicity in the circumstances of this case.

1

2

3

s recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." (*Patton v. Yount* (1984) 467 U.S. 1025, 1035.) "[J]uror *impartiality* ... does not require *ignorance.* [Citations.]" (*Skilling v. United States* (2010) 561 U.S. 358, 360–361 [130 S.Ct. 2896, 2915].)

4

5

6

7

8

9

We have examined the media reports submitted by defendant. Although such reports were frequent, particularly in 2006, their number and frequency had dropped significantly by the time of trial. (See *People v. Prince, supra,* 40 Cal.4th at p. 1218; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46.)[55] The coverage was largely factual and noninflammatory. There was mention of the Aguirre shooting, evidence of which was never admitted at trial. There were also references to the charge of misdemeanor possession of child pornography. Prospective jurors who recalled either subject were questioned during individual voir dire concerning the effect such information might have on their ability to be fair and impartial.

10

11

12

13

Insofar as the record before us shows, many of the prospective jurors—including all but two or three who became trial or alternate jurors—had little or no knowledge beyond the basic facts of the case that were reported early on. Many—including all trial jurors and alternates—stated they either had formed no opinion as to guilt or had not formed a fixed opinion, and could base a verdict solely on the evidence presented at trial. (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1323.) The trial court excused those who had prejudged defendant's guilt or did not appear able to return a verdict based solely on the trial evidence.[56]

14

15

16

17

18

19

20

21

It is true "the fact that the jurors declared they could decide the case impartially on the evidence does not preclude the necessity of a change of venue." (*Daniels, supra,* 52 Cal.3d at p. 853; see *People v. Cooper* (1991) 53 Cal.3d 771, 807 [juror declarations of impartiality not conclusive].) " 'In exceptional cases, " 'adverse pretrial publicity can create such a *presumption* of prejudice in a community that the jurors' claims that they can be impartial should not be believed,' [citation]...." [Citation.] "The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [United States Supreme] Court has presumed prejudice can only be termed extraordinary, [citation], and it is well-settled that pretrial publicity itself—'even pervasive, adverse publicity—does not inevitably lead to an unfair trial' [citation]." [Citation.] This prejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire.' [Citation.]" (*People v. Farley, supra,* 46 Cal.4th at p. 1086.)

22

23

24

"The present case does not fall 'within the limited class of cases in which prejudice would be presumed under the United States Constitution.' [Citation.]" (*People v. Farley, supra,* 46 Cal.4th at p. 1087; see *Beck v. Washington* (1962) 369 U.S. 541, 557.) Although jurors' assurances of impartiality are not dispositive, we are not free to ignore them. (*People v. Rountree* (2013) 56 Cal.4th 823, 841.) New's testimony notwithstanding, we find no reason to doubt the

25

26

27

28

---

[55] Defendant himself contributed to the publicity blitz, giving interviews to several media outlets.

[56] Our review of voir dire showed around 60 people excused for publicity-related bias. Assuming this number was higher than would occur in an ordinary criminal trial, " 'it by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own.' [Citation.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1085.)

actual jurors' and alternates assertions they could be fair. (See *People v. Cooper, supra,* 53 Cal.3d at p. 807.)[57]

Defendant says, however, that prospective jurors' claims of impartiality were "necessarily tainted" by the manner in which the trial court conducted the individual voir dire. Defendant accuses the court of "obviously [becoming] irritated and frustrated ... when confronted with the number of prospective jurors who had formed an opinion" concerning defendant's involvement in events, and sometimes being "confrontational with the prospective jurors" in its attempts to rehabilitate them. Because this "created an intimidating environment," the argument runs, we should not "defer to the trial court's findings that the jury as empaneled was a fair and impartial jury."

To the extent defendant gives *any* citation to the record in support of his claim, he cites to "ART Vols. 1–6"—the whole of examination concerning and excusals for hardship *and* individual voir dire, and almost a day's worth of regular voir dire. This is patently inadequate. Rule 8.204(a)(1)(C) expressly requires each brief—including those filed in criminal appeals (see rule 8.360(a))—to "[s]upport any reference to a matter in the record by a citation to the volume *and page number* of the record where the matter appears." (Italics added.) Moreover, our review of voir dire manifestly does *not* support defendant's assertion. It is true the trial court became aware some prospective jurors felt intimidated, and it thereafter attempted to put them at ease. However, it is readily apparent that what most of those prospective jurors found intimidating was the unavoidable formality and seriousness of the situation, together with the number of people present in the jury room, where individual voir dire was conducted.[58] "We defer to the trial court's discretion regarding the manner of conducting voir dire" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 197), and none of the attorneys had any objection to examining each prospective juror individually in the jury room.[59] The manner in which voir dire was conducted gives us no cause to doubt jurors' claims of impartiality or the trial court's implicit findings in that regard.

By our count, approximately 175 prospective jurors were individually examined. The fact 75 prospective jurors remained at the conclusion of all voir dire ensured ample individuals from whom to choose and who could give defendant a fair trial. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 30.) That defendant did not challenge for cause any of the sitting trial or alternate jurors "is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." (*Beck v. Washington, supra,* 369 U.S. at pp. 557–558; accord, *People v. Farley, supra,* 46 Cal.4th at p. 1085.)

The third factor to be considered is the size of the community. "The larger the local population, the more likely it is that preconceptions about the case have not

---

[57] New did not point to a single specific remaining prospective juror he believed could not be impartial. Rather, he expressed concern that some people who should have been excused "probably slipped through...." His testimony would require that venue be changed in virtually any case that engendered extensive publicity that reached many members of the jury pool. Such is not the law.

[58] As one prospective juror remarked, when confronted with the judge, court clerk, court reporter, two bailiffs, four attorneys, defendant, and possibly the jury consultant, "If you would have T-shirts and jeans it might have helped."

[59] Indeed, New testified: "[I]individual questioning and the way it was done is a huge improvement over [a] group setting...." He also stated: "[T]he studies lists [*sic*] things pointing out all the things you should do, pointing out all the things that are bad about voir dire. And many of those things, the group setting, the formality, were avoided in this case. Formality is obviously a matter of degree, but you didn't have people in the courtroom with, you know, your Honor in his robe in his elevated seat. You didn't have ... all those barriers to disclosure...."

become imbedded in the public consciousness. [Citation.]" (*People v. Balderas* (1985) 41 Cal.3d 144, 178.) Conversely, " '[t]he smaller the community, the greater the likelihood the accused will not get a fair trial in a case of this nature.' [Citations.]" (*People v. Adcox* (1988) 47 Cal.3d 207, 233.) According to California Department of Finance figures for 2008, Kings County had a population of slightly more than 150,000, making it the 32d most populous of California's 58 counties. (Cal. Statistical; Abstract (48th ed. 2009) Dept. of Finance, table B–3, at <http://www.dof.ca.gov/html/fs_data/stat-abs/Statistical_Abstract.php> [as of Aug. 25, 2014].)[60] We find this factor to be neutral or weighing only slightly in favor of granting a venue change. (See *People v. McCurdy* (Aug. 14, 2014, S061026) —— Cal.4th ——, —— [2014 Cal. Lexis 5467, *20] [population size of Kings County "at most somewhat favored" venue change; critical factor is whether size of population was sufficient to dilute adverse publicity]; *People v. Webb* (1993) 6 Cal.4th 494, 514 [motions to change venue granted where county is relatively isolated and small, such as Placer County (population then 106,500) or Lassen County (population then 17,500), in contrast to San Luis Obispo County (population then almost 200,000) ].)

Turning to the final factors—the status of the defendant, and prominence and popularity of the victim—we conclude they weigh against a change of venue. Neither defendant nor Deborah was an outsider to the community (see *Daniels, supra,* 52 Cal.3d at p. 852), and while it is apparent Deborah was generally loved and respected by those who knew her, she was not especially prominent prior to her disappearance (see *People v. Alfaro, supra,* 41 Cal.4th at p. 1323; *People v. Pride* (1992) 3 Cal.4th 195, 225). Any posthumous prominence she achieved through news accounts did not favor a change of venue; in light of the fact she led a relatively obscure life, "the community was not likely to have experienced a uniquely heightened sense of loss or anger which would presumably be alleviated by trial in another county. Any sympathetic features of the case would be apparent wherever it was tried." (*People v. Webb, supra,* 6 Cal.4th at pp. 514–515.) Likewise, any unsympathetic features of the case—for example, the allegations defendant pilfered his children's trust accounts—would also be apparent wherever the case was tried.

Considering the foregoing factors as a whole (*People v. Gallego* (1990) 52 Cal.3d 115, 167), and having independently review the record (*People v. Famalaro, supra,* 52 Cal.4th at p. 31), "[w]e ... conclude that on appeal defendant has not shown a reasonable likelihood that he did not receive a fair trial before an impartial jury. The jury voir dire bore out the trial court's conclusion that a fair jury could be chosen." (*People v. Lewis* (2008) 43 Cal.4th 415, 450, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918–920.) "Neither the publicity nor the small size of the community was reasonably likely to, and neither did, result in a jury pool from which [defendant] could not select a number of jurors unaffected by the publicity." (*People v. Hayes, supra,* 21 Cal.4th at p. 1251.)

---

[60] Defendant requests that we take judicial notice of the pertinent population figures. Official census data is frequently utilized by reviewing courts in determining whether the size of the community might have affected the impact of pretrial publicity, and is a proper subject of judicial notice. (*People v. Jurado* (1981) 115 Cal.App.3d 470, 482–483.) Accordingly, we take judicial notice of the United States Census Bureau and California Department of Finance figures set out in the parties' briefs and this opinion. (Evid.Code, §§ 452, subd. (h), 459.) For edification of appellate counsel, however, we note that rule 8.252(a) requires the service and filing of a separate motion, along with a proposed order, to obtain judicial notice by a reviewing court.

1   Hawk, 2014 WL 4243705, at *23–33 (footnotes in original).

2   "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349

3   U.S. 133, 136 (1955). Thus, the Constitution "do[es] not impede transfer of the proceeding to a

4   different district at the defendant's request if extraordinary local prejudice will prevent a fair

5   trial." Skilling v. United States, 561 U.S. 358, 378, 130 S. Ct. 2896 (2010). "To support a change

6   of venue request, the defendant must establish either presumed or actual prejudice." Murray v.

7   Schriro, 882 F.3d 778, 802 (9th Cir. 2018).

8   In a line of cases addressing whether due process requires a change of venue, the

9   Supreme Court has overturned convictions in cases that were "entirely lacking in the solemnity

10   and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness

11   and rejects the verdict of a mob," but the decisions do not "stand for the proposition that juror

12   exposure to . . . news accounts . . . alone presumptively deprives the defendant of due process."

13   Murphy v. Florida, 421 U.S. 794, 799 (1975). "The Supreme Court has explained that a court

14   may presume prejudice only when the 'trial atmosphere [is] utterly corrupted by press coverage,'

15   or when 'a wave of public passion . . . ma[kes] a fair trial unlikely by the jury . . .'" Murray, 882

16   F.3d at 802 (first quoting Dobbert v. Florida, 432 U.S. 282, 303 (1977); then quoting Patton v.

17   Yount, 467 U.S. 1025, 1040 (1984)). "Prominence does not necessarily produce prejudice, and

18   juror impartiality, we have reiterated, does not require ignorance. A presumption of prejudice,

19   our decisions indicate, attends only the extreme case." Skilling, 561 U.S. at 381 (citations

20   omitted).

21   For example, in Rideau v. Louisiana, 373 U.S. 723 (1963), the police filmed the

22   defendant's interrogation, which was conducted without counsel and resulted in a confession. On

23   three separate occasions shortly before trial, a local television station broadcast the filmed

24   interrogation and confession to audiences ranging from 24,000 to 53,000 individuals for a crime

25   that had occurred in a parish with a population of approximately 150,000 people. Id. at 724.

26   Estes v. Texas, 381 U.S. 532, 535 (1965), involved "[m]assive pretrial publicity totaling 11

27   volumes of press clippings." There were at least twelve cameramen in the courtroom for a two-

28   day pretrial hearing that was "carried live by both radio and television, and news photography

1  was permitted throughout," which "led to considerable disruption of the hearings," denied the

2  "judicial serenity and calm to which [the defendant] was entitled," and resulted in "a

3  bombardment of the community with the sights and sounds" of the hearing. Id. at 536, 538. In

4  Sheppard v. Maxwell, 384 U.S. 333 (1966), "[f]or months virulent publicity about Sheppard and

5  the murder had made the case notorious" before trial, "bedlam reigned at the courthouse during

6  the trial and newsmen took over practically the entire courtroom," and "jurors were thrust into

7  the role of celebrities by the judge's failure to insulate them from reporters and photographers."

8  Id. at 354, 355, 353.

9       Petitioner's case is manifestly different from the above cases in which the Supreme Court

10  has presumed juror prejudice based on publicity. Here, the state court found that although "the

11  nature of the case led to extensive and occasionally sensationalized media coverage," and media

12  "reports were frequent, particularly in 2006, their number and frequency had dropped

13  significantly by the time of trial," and "[t]he coverage was largely factual and noninflammatory."

14  Hawk, 2014 WL 4243705, at *30. There is no indication that any portion of Petitioner's criminal

15  proceedings was "entirely lacking in the solemnity and sobriety to which a defendant is entitled,"

16  Murphy, 421 U.S. at 799, and thus, does not rise to the level of "the extreme case" to which a

17  presumption of prejudice attends.

18      "In the alternative, a defendant may establish the existence of actual prejudice if, during

19  voir dire, potential jurors who have been exposed to pretrial publicity express bias or hostility

20  toward the defendant that cannot be cast aside." Murray, 882 F.3d at 802–03 (citing Skilling, 130

21  S. Ct. at 2918 & n.20). "When pretrial publicity is at issue, 'primary reliance on the judgment of

22  the trial court makes [especially] good sense' because the judge 'sits in the locale where the

23  publicity is said to have had its effect' and may base her evaluation on her 'own perception of the

24  depth and extent of news stories that might influence a juror.'" Skilling, 561 U.S. at 386 (quoting

25  Mu'Min v. Virginia, 500 U.S. 415, 427 (1991)). The Supreme Court has "repeatedly

26  emphasized" that jury selection is "particularly within the province of the trial judge," and

27  "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a

28  juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors

1  impossible to capture fully in the record—among them, the prospective juror's inflection,

2  sincerity, demeanor, candor, body language, and apprehension of duty." Skilling, 561 U.S. at 386

3  (quoting Ristaino v. Ross, 424 U.S. 589, 594–95 (1976)) (citing Reynolds v. United States, 98

4  U.S. 145, 156–57 (1879)).

5       Here, the state court found that "all but two or three" trial jurors and alternates "had little

6  or no knowledge beyond the basic facts of the case that were reported early on," "all trial jurors

7  and alternates . . . stated they either had formed no opinion as to guilt or had not formed a fixed

8  opinion, and could base a verdict solely based on the evidence at trial," and the "trial court

9  excused those who had prejudged defendant's guilt or did not appear able to return a verdict

10  based solely on the trial evidence." Hawk, 2014 WL 4243705, at *31. The trial court stated:

11              "I spent eight days going through the voir dire process. And I have
               a lot of confidence in the voir dire process. I was able to review the
12              jurors. I was able to watch their body language. I was able to watch
               the way they responded to the questions. And I'm satisfied in my
13              mind that Mr. Hawk can get a fair trial in Kings County...."

14  Hawk, 2014 WL 4243705, at *27. As on direct appeal, Petitioner does not direct the Court's

15  attention to anywhere in the record that shows "potential jurors who [were] exposed to pretrial

16  publicity [and] express[ed] bias or hostility toward the defendant that [could not] be cast aside,"

17  Murray, 882 F.3d at 802–03, and were allowed to remain.

18       Based on the foregoing, the California Court of Appeal's denial of Petitioner's venue

19  claim was not contrary to, or an unreasonable application of, clearly established federal law, nor

20  was it based on an unreasonable determination of fact. The state court's decision was not "so

21  lacking in justification that there was an error well understood and comprehended in existing law

22  beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly,

23  Petitioner is not entitled to habeas relief on his venue claim, and it should be denied.

24       **C.  Fourth Claim for Relief**

25       In his fourth claim for relief, Petitioner asserts that "[w]hen substantial evidence showed

26  that Petitioner was not present during the crime, the State failed to meet its burden to show

27  presence (not charged with murder for hire or conspiracy)." (ECF No. 1 at 5.) The petition's

28  supporting facts state:

> There was no evidence that Petitioner had been present in the victim's home and van at the time of her disappearance. Petitioner was not charged with murder-for-hire nor with conspiracy. The State did not refute Petitioner's claim that he was not present at the time of his ex-wife's disappearance and then-presumed death. This claim is now unexhausted as new evidence has been discovered. [T]he body of the victim was found on March 22, 2016, and it is being tested by the State. Petitioner has not yet received the results of these tests.

(Id.) Respondent argues that Petitioner's claim is unexhausted and should be denied on the merits because it is conclusory. (ECF No. 59 at 45.)

    1.  <u>Exhaustion</u>

A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991); <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971).

To provide the highest state court the necessary opportunity, the petitioner must "fairly present" the claim, <u>Duncan</u>, 513 U.S. at 365, with "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief," <u>Gray v. Netherland</u>, 518 U.S. 152, 162–63 (1996). <u>Accord</u> <u>Davis v. Silva</u>, 511 F.3d 1005, 1009 (9th Cir. 2008) ("Fair presentation requires that the petitioner 'describe in the state proceedings both the operative facts and the federal legal theory on which his claim is based so that the state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim.'" (citations omitted)).

In his petition for review on direct appeal, Petitioner asserted the claim that "the prosecution did not establish beyond a reasonable doubt that appellant was present at the time of the homicide," arguing that "[a] conviction cannot stand where there is <u>no</u> evidence connecting

1   the accused to the commission of the charged offense, and such a conviction is a denial of due

2   process of law under the Sixth and Fourteenth amendments (*In re Winship* ( 1970) 397 U.S. 358,

3   364; *Jackson v. Virginia* (1979) 443 U.S. 307, 313-324)[.]" (ECF No. 58-49 at 35, 36

4   (capitalization omitted).) In his petition for review of the appellate court's denial of habeas relief,

5   Petitioner "submit[ted] all of the grounds for relief which he has submitted in the lower courts in

6   order to exhaust his state remedies," including a claim of "[a]ctual of factual innocence." (ECF

7   No. 58-53 at 10 (capitalization omitted).) The state habeas petition filed in the California Court

8   of Appeal, in turn, asserted a claim of "[a]ctual or factual innocence" based on Petitioner's

9   introduction of "substantial direct and circumstantial evidence during the trial regarding his alibi

10  that demonstrate he was not present at the time the homicide occurred" and the location of the

11  recently discovered victim's body that "provides additional evidence to support the alibi." (ECF

12  No. 58-51 at 6.) In his state habeas petition filed in the California Supreme Court, Petitioner

13  asserted, *inter alia*, the following claims for relief:

14      **Claim 1.1.** asserts that the new evidence (Att. 2.1.-5., Verification)
        provides an alibi defense. (*People v. Weber* (1904) 149 Cal. 325,
15      347 [*Weber*].)

16      **Claim 1.2.** asserts that a third-party culpability defense exists
        based upon the new evidence. (*Holmes* v. *South Carolina* (2006)
17      547 U.S. 319, 324 ["*Holmes*"] quoting *Crane* v. *Kentucky* (1986)
        476 U.S. 683, 690 ["*Crane*"] quoting *California v. Trombetta*
18      (1984) 467 U.S. 479, 485 ["*Trombetta*"]) and

19      **Claim 1.3.** asserts that Petitioner is factual ""innocence "" (*Reno,
        supra,* 55 Cal.4th 428, 458 citing *In re Lawley* (2008) 42 Cal.4th
20      1231, 1239) based upon the new evidence (Att. 2.1.-5.,
        Verification) that "undermin[es] the prosecution's case and
21      poin[ts] unerringly to [] innocence" or at least "reduced
        culpability" exists (*Reno, supra,* 55 Cal.4th 428, 474 quoting
22      *Clark,* at p. 797, fn. 32; *In re Lawley, supra,* 42 Cal.4th 1231,
        1239).

23

24  (ECF No. 58-55 at 21.)

25          Respondent argues that the fourth claim for relief is unexhausted because it does not

26  claim "actual innocence" as the claims raised in state court did and the federal petition does not

27  cite to any of the facts set forth in his state habeas petitions. (ECF No. 59 at 45.) As set forth in

28  section I, *supra*, the instant federal habeas petition was prepared by counsel and filed after the

1   victim's body was recovered but before the remains were forensically examined and DNA

2   evidence was tested. The Court stayed this action pending exhaustion in state court. When the

3   successive state habeas petition was denied by the California Supreme Court, this Court lifted the

4   stay. Petitioner's counsel moved to withdraw before filing an amended petition that included

5   updated information regarding the victim's body and test results. After a status conference in

6   which this Court consulted with Petitioner about the outdated nature of the original petition and

7   the various options available, Petitioner elected not to amend his petition to include any updated

8   information. (ECF No. 55.) In light of the procedural history of the petition and Petitioner's *pro

9   se* status, the Court will construe the fourth claim for relief as challenging the sufficiency of the

10  evidence with respect to the murder conviction, as Petitioner argued on direct appeal to the

11  California Court of Appeal and California Supreme Court. (LDs 42, 44, 45, 47, 49.)

12  Accordingly, in light of this construction, the fourth claim for relief is exhausted.[61]

13       2.  Merits Analysis

14       Petitioner's sufficiency of the evidence claim was raised on direct appeal in the

15  California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

16  decision. The claim was also raised in the petition for review, which the California Supreme

17  Court summarily denied. As federal courts "look through" summary denials and review "the last

18  related state-court decision that does provide a relevant rationale," Wilson, 138 S. Ct. at 1192,

19  this Court will examine the decision of the California Court of Appeal.

20       In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal

21  stated:

22                      ***MOTIONS FOR JUDGMENT OF ACQUITTAL***

23       Defendant moved for a judgment of acquittal (§ 1118.1) at the close of the
         prosecution's case-in-chief and again at the close of all evidence. The trial court
24       denied both motions. Defendant says the court erred, because there was

25  _____

26  [61] "AEDPA . . . restricts the scope of the evidence that we can rely on in the normal course of discharging our
    responsibilities under § 2254(d)(1)." Murray v. Schriro, 745 F.3d 984, 998 (9th Cir. 2014). "AEDPA's 'backward-
27  looking language requires an examination of the state-court decision at the time it was made. It [then logically]
    follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the
    state court.'" Id. (alteration in original) (quoting Cullen v. Pinholster, 563 U.S. 170, 182 (2011)). Accordingly, this
28  Court will limit review to the record before the state courts on direct appeal before the victim's body was recovered.

insufficient evidence to establish he was the perpetrator of Deborah's murder. We disagree.[62]

Section 1118.1 provides, in pertinent part: "In a case tried before a jury, the court on motion of the defendant ..., at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." When such a motion is made at the close of the prosecution's case-in-chief, " 'the sufficiency of the evidence is tested as it stood at that point' in the trial [citation] — in other words, based on the prosecution's case alone, and without considering the evidence subsequently adduced during the presentation of the defense case...." (*People v. Watkins, supra,* 55 Cal.4th at p. 1019.)

Regardless of when the motion is made, "[a] trial court should deny a motion for acquittal under section 1118.1 when there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged. [Citations.]" (*People v. Mendoza, supra,* 24 Cal.4th at p. 175.) In other words, "the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence." (*People v. Harris, supra,* 43 Cal.4th at p. 1286.) Under this standard, the test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime—and the identity of the criminal—beyond a reasonable doubt. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1083, overruled on another ground in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1; *People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*People v. Johnson, supra,* at p. 578.)

We independently review a ruling on a motion under section 1118.1 (*People v. Harris, supra,* 43 Cal.4th at p. 1286; see *People v. Cole* (2004) 33 Cal.4th 1158, 1213), keeping in mind that where the trial court has denied the motion, "we must ... assume in favor of its order the existence of every fact from which the jury could have reasonably deduced from the evidence whether the offense charged was committed and if it was perpetrated by the person ... accused of the offense. [Citations.] Accordingly, we may not set aside the trial court's denial of the motion on the ground of the insufficiency of the evidence unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below. [Citations.]" (*People v. Wong* (1973) 35 Cal.App.3d 812, 828; accord, *People v. Cuevas* (1995) 12 Cal.4th 252, 261; *People v. Allen* (2001) 86 Cal.App.4th 909, 913–914.)

---

[62] Although defendant's motions in the trial court were directed at all counts, here he challenges only the sufficiency of the evidence concerning the murder count.

The Attorney General calls into question the appealability of this issue. Although it appears defendant could not have appealed from the denial of either motion itself (§ 1237; *People v. Rocovich* (1969) 269 Cal.App.2d 489, 490; *People v. Aguilar* (1959) 174 Cal.App.2d 662, 663), we see no reason the matter may not be reviewed on appeal from the judgment (cf. *People v. Peter* (1932) 125 Cal.App. 657, 659). The California Supreme Court has consistently done so. (E.g., *People v. Jones* (2013) 57 Cal.4th 899, 964–965; *People v. Watkins* (2012) 55 Cal.4th 999, 1018–1020; *People v. Harris* (2008) 43 Cal.4th 1269, 1286; *People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 89–90; *People v. Mendoza* (2000) 24 Cal.4th 130, 175–176; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1173; *People v. Lines* (1975) 13 Cal.3d 500, 504–506; *People v. Miller* (1969) 71 Cal.2d 459, 477–478.) Accordingly, we conclude the issue is properly before us.

"[W]here ... there is evidence from which an inference of guilt is justified a case will not be taken from the jury because an inference of innocence might also be drawn therefrom. [Citation.]" (*People v. Wescott* (1950) 99 Cal.App.2d 711, 714; see *People v. Holt* (1997) 15 Cal.4th 619, 669.) However, "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) Similarly, "[w]hen ... the trier of fact has relied on inferences, those inferences must be reasonable. An inference is not reasonable if it is based only on speculation. [Citation.]" (*People v. Holt, supra,* at p. 669; see *Coleman v. Johnson* (2012) 566 U.S. —— [132 S.Ct. 2060, 2064].)

We set out the evidence at length in the statement of facts, *ante,* and need not repeat it here. Viewed as a whole in the light most favorable to the prosecution's case, it was sufficient to establish defendant's guilt as the perpetrator of Deborah's murder, whether viewed as it stood at the conclusion of the prosecution's case-in-chief or at the conclusion of the presentation of all evidence.

Defendant was the only person with a motive to harm Deborah. While a jury may not convict based upon evidence of motive alone (see *People v. Riggs, supra,* 44 Cal.4th at p. 314), motive may be probative of issues such as intent and commission of the criminal act itself (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017–1018). The presence of motive is "particularly significant" when, as here, there is an absence of physical evidence linking the defendant to the killing. (*People v. Garceau* (1993) 6 Cal.4th 140, 177, overruled on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118.)

Evidence defendant knew Deborah would not let matters rest with respect to child support and custody, and that she intended to present evidence against him that could ultimately preclude his ability to take from his children's trust accounts, "is relevant to establish a motive on the part of defendant to prevent [Deborah] from giving any such [evidence]. From the fact of such motive, it is reasonable to infer that defendant acted in conformity with that motive and killed [Deborah] to prevent [her] from [presenting evidence] against defendant." (*People v. De La Plane* (1979) 88 Cal.App.3d 223, 246, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25.)

Defendant's animosity toward Deborah was longstanding. Royer described defendant's opinion that there was not enough punishment in the world for the crimes Deborah had committed against him, and described defendant's statements that his family law issues would not be over until Deborah was dead. Conrad described the level of feeling defendant had for Deborah as "extreme hatred."

Moreover, the evidence did not show merely that defendant possessed a motive for killing Deborah. Shortly after Deborah disappeared, defendant and Royer were observed drinking wine and toasting.

In an interview conducted on July 10, 2006, Chelsa informed Matteson that a day or two after Deborah went missing, defendant, the children, and Deborah's parents went to dinner. After Deborah's parents left, defendant said something to the effect of, "see now that your mom's not here we can all get along better," or something like "[s]he was part of the problem" and "[i]t was tense when she was around." Jurors reasonably could infer, from the fact defendant made such

50

statements after Deborah had only been missing a matter of days, that defendant knew she was dead.

About a month after Deborah's disappearance, when Conrad said he was feeling sad about Deborah disappearing, defendant said the girls had identified the problem, dealt with it, and moved on, and he asked why Conrad could not do the same. When Conrad told defendant that getting his driver's license was far down the list of things on his mind, defendant responded saying they could not let "this little unfortunate set of circumstances" disrupt their lives or disrupt their daily routine.

As for the crime, itself, the evidence reasonably leads to the inference Deborah was specifically targeted and the murder was planned, as opposed to Deborah being in the wrong place at the wrong time. There was no forced entry to the house and no theft of cash, jewelry, or electronic items that could readily be sold. Gassaway's license plate was stolen ahead of time and placed on Deborah's company minivan. The killer went to the trouble of dragging Deborah through the house and garage to dispose of her body.

The evidence also reasonably leads to the inference Deborah was targeted by someone who was interested in the information she was about to reveal in court — information that would have shown defendant was stealing from their children. Only defendant fit this bill.

Jurors reasonably could infer from the evidence that defendant knew how to gain access to Deborah's house and had engaged in planning behavior. In light of Chelsa's and Savannah's habit of keeping their house keys in their backpacks or sometimes, in Chelsa's case, in her purse, defendant had frequent, multiple opportunities to have a copy made. He was twice seen driving by and taking pictures of Deborah's house. One of these occasions was toward the end of the school year, which was the relevant time period of the murder.

Although defendant sought to establish, principally through Chelsa's testimony, an alibi for the time of the attack on Deborah, there was evidence he could have exited the house through his bedroom window rather than the door across the hall from Chelsa's room. Significantly, his alibi depended on the jury believing Chelsa was a light enough sleeper that she would have heard him leave the house had he done so, yet evidence was presented that she was not nearly as light a sleeper as she testified to being.

When defendant was asked to come to the police station around 2:20 a.m. on June 14, 2006, he did not ask why, or do what most parents would do in that situation: inquire about his children's well-being. Likewise, he did not do so once he was at the police station. When initially told Deborah was missing, he still did not ask about the children. He only asked about the children once the interview was being recorded.

There was also the evidence of defendant's conversations with Marshall. In particular, defendant's comments about the police not taking his work boots, which he would have worn if he was "gonna go dispose of a dead body somewhere" because they were "more durable"; his response to Marshall's inquiry as to why a killer would bring anything back to the house, that he would just "turn the hose on it" and they would "never be able to figure it out"; and his opinion that the authorities would not find Deborah because the rivers were "too full," "running," and there was wildlife, and if thrown off a bridge, the body would flow downstream, decompose, break apart, and go away.

51

Additionally, when discussing a particular portion of the Kings River with Marshall, defendant said: "All that vegetation on one side all that, it's almost like a delta. There is so much stuff. They'll never find a body[,] you can't go walking through that stuff. You can't get in there. Even with boats and jet ski's you couldn't, you couldn't [s]earch that whole area." This is particularly significant in light of the condition of Deborah's van when it was found. It appeared to have been driven off road, and had vegetation and considerable amounts of soil on it that jurors reasonably could have concluded were consistent with what would be found in the environs of the local river.

Although, the prosecution's evidence that defendant murdered Deborah was entirely circumstantial and perhaps not overwhelming or irrefutable, it was certainly sufficient to support the conviction. (*People v. Garcia* (2005) 36 Cal.4th 777, 804–805 (*Garcia*).)[63] Accordingly, the trial court properly denied defendant's motions for judgment of acquittal.

Hawk, 2014 WL 4243705, at *37–40 (footnotes in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011). No "particular form of evidence is required to support the Court of Appeal's reasoning or the jury's verdict." Lucero v. Holland, 902 F.3d 979, 992 (9th Cir. 2018). "Circumstantial evidence and inferences drawn from

---

[63] We recognize the California Supreme Court reversed the conviction in *Garcia*. It did so not because the evidence was insufficient to support the conviction, however, but because, in light of the fact the evidence "was not overwhelming or irrefutable" (*Garcia, supra,* 36 Cal.4th at p. 804), the trial court committed prejudicial error by barring defendant and defense counsel from being present during a return visit to the crime scene that jurors requested after two days of deliberation (*id.* at pp. 806–807).

1   it may be sufficient to sustain a conviction." Ngo v. Giurbino, 651 F.3d 1112, 1114 (9th Cir.

2   2011) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). A federal court's "job

3   under AEDPA is to avoid a 'type of fine-grained factual parsing' that does not accord deference

4   to either jurors or state courts, and instead to survey *any* possible fact in the record that could

5   support, directly or circumstantially, the jury's conviction." Lucero, 902 F.3d at 992 (citing

6   Coleman, 566 U.S. at 655). "[A] federal court may not overturn a state court decision rejecting a

7   sufficiency of the evidence challenge simply because the federal court disagrees with the state

8   court. The federal court instead may do so only if the state court decision was 'objectively

9   unreasonable.'" Cavazos, 565 U.S. at 2. "Because rational people can sometimes disagree, the

10  inevitable consequence of this settled law is that judges will sometimes encounter convictions

11  that they believe to be mistaken, but that they must nonetheless uphold." Id.

12          Viewing the evidence in the light most favorable to the prosecution, there was evidence

13  from which the jury rationally could find: (1) that the murder was specifically targeted and

14  planned given there was no forced entry to the house, no theft of cash, jewelry, or other valuable

15  items that could readily be sold, selective rummaging and ransacking of papers in the living

16  room desk and the desk in Deborah's bedroom office,[64] and a license plate was stolen beforehand

17  and placed on Deborah's company minivan; (2) that Petitioner's longstanding animosity towards

18  Deborah and his knowledge that she intended to present evidence that he took thousands of

19  dollars from his children's trust accounts, which in turn could result in Petitioner being barred

20  from future access to the trust accounts, created motive; (3) that Petitioner had engaged in

21  planning behavior on at least two occasions by driving by and taking pictures of Deborah's

22  house a month or two before Deborah's disappearance; (4) that Petitioner could gain entry to

23  Deborah's house without force given he had access to Chelsa's and Savannah's backpacks

24  and/or purses in which they kept their house keys and thus, could easily have a copy made; and

25  (5) that Petitioner had the opportunity to commit the offense because the alibi defense depended

26  largely on Chelsa's testimony that she was a very light sleeper and would have heard Petitioner

27

28  [64] "The paperwork that was scattered on the top of the [bedroom office] desk included account summaries for Deborah's retirement account, and the first set of children's trust funds." Hawk, 2014 WL 4243705, at *9.

1  leave the house had he done so, but evidence was presented that Chelsa was not as light a sleeper

2  as she testified to being and that Petitioner could have left the house without going near Chelsa's

3  room.

4        "Although the evidence presented at trial could yield an alternative inference, we 'must

5  respect the exclusive province of the [jury] to determine the credibility of witnesses, resolve

6  evidentiary conflicts, and draw reasonable inferences from proven facts.'" Long v. Johnson, 736

7  F.3d 891, 896 (9th Cir. 2013) (quoting United States v. Archdale, 229 F.3d 861, 867 (9th Cir.

8  2000)). "And, although the evidence was circumstantial, a conviction—even for murder—may

9  rest solely on such evidence." Long, 736 F.3d at 896. "The jury in this case was convinced, and

10  the only question under Jackson is whether that finding was so insupportable as to fall below the

11  threshold of bare rationality." Coleman, 566 U.S. at 656. Moreover, "after AEDPA, we apply the

12  standards of Jackson with an additional layer of deference to state court findings." Ngo, 651 F.3d

13  at 1115 (internal quotation marks and citation omitted). Thus, under this "double dose of

14  deference that can rarely be surmounted," Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011),

15  the state court's denial of Petitioner's sufficiency of the evidence claim was not contrary to, or an

16  unreasonable application of, clearly established federal law, nor was it based on an unreasonable

17  determination of fact. The decision was not "so lacking in justification that there was an error

18  well understood and comprehended in existing law beyond any possibility for fairminded

19  disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief

20  on his sufficiency of the evidence claim, and it should be denied.

21  **V.**

22  **RECOMMENDATION**

23        Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of

24  habeas corpus be DENIED.

25        This Findings and Recommendation is submitted to the assigned United States District

26  Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

27  Rules of Practice for the United States District Court, Eastern District of California. Within

28  **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 12, 2023**            /s/ _Erica P. Grosjean_
                                       UNITED STATES MAGISTRATE JUDGE